Walter WOE, by his mother and guardian, Wilma WOE, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

Mario CUOMO, individually and as Governor of the State of New York; Dr. Steven Katz, M.D., individually and as Commissioner of the Department of Mental Hygiene of the State of New York; Dr. E. Richard Feinberg, M.D., individually and as Director of Bronx Psychiatric Center; Dr. Ordogan Tekben, M.D., individually and as Director of Mid-Hudson Psychiatric Center, Defendants.

No. 75 CV 1029 (ERN).

United States District Court, E.D. New York.

July 1, 1986.

Morton Birnbaum, Brooklyn, N.Y., Burton H. Zuckerman, Mark J. Kurzmann, New York City, for plaintiffs.

Robert Abrams, Atty. Gen., State of N.Y., New York City, for defendants by Caren S. Brutten, Arnold D. Fleischer, Asst. Attys. Gen.; New York State Office of Mental Health, New York City, by John Petrila, and Nancy H. Halleck, of counsel.

## MEMORANDUM AND ORDER

NEAHER, District Judge.

This case returns to the Court on remand from the Court of Appeals, which entered the following order,

> "Accordingly, we affirm the judgment of the district court with respect to the state law and equal protection claims, and reverse and remand the right-to-treatment claim to the extent we have hitherto indicated."

*Woe v. Cuomo,* 729 F.2d 96, 108 (2nd Cir. 1984), *cert. denied,* — U.S. —, 105 S.Ct. 339, 83 L.Ed.2d 274 (1984).

To comprehend the nature of its responsibility under the Court of Appeals' mandate, the Court must examine the entire opinion of the Court of Appeals. *See Cherokee Nation v. Oklahoma,* 461 F.2d 674, 678 (10th Cir.1972). The significance of this observation stems from plaintiffs' contention that the Court of Appeals, in essence, has decided the case in their favor by adopting their propostion of law, to wit: absence of JCAH (Joint Commission on Accreditation of Hospitals) accreditation of a

hospital for the mentally ill establishes that the hospital is not rendering care of a constitutionally adequate quality. *See Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982). To support their contention, they rely on the following passage,

> "Of course, where a facility lacks accreditation by JCAH, not even a prima facie showing of adequacy exists."

729 F.2d at 107.

To comply with the Court of Appeals order, this Court held hearings on May 15, 16, and 17, June 5 and 6, and August 20 and 21, 1985, to receive testimony and documentary evidence on the issue of constitutionally adequate care as related to plaintiffs' claims concerning the quality of care at Mid-Hudson Psychiatric Center (Mid-Hudson) and Bronx Psychiatric Center (BPC).[1] In accord with the Court of Appeals' order, the following constitutes the Court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

At the outset, the Court is concerned about defendants' posture at the hearings and in their subsequent papers. Defendants assert that neither the record nor the law support the granting of the relief proposed by plaintiffs. Defendants seemingly overlook that,

> "The district court has broad discretion to fashion an equitable remedy that meets the practical demands of the situation, as well as the requirements of the Constitution."

*Felton v. Secretary, etc.*, 787 F.2d 35, 37 (2d Cir.1986). Thus, even if the record does not support the precise relief requested by plaintiffs, this Court is not prohibited from granting less or different relief. *See Perfect Fit Industries, Inc. v. Acme Quilting Co.*, 646 F.2d 800, 806 (2d Cir.1981), *cert. denied*, 459 U.S. 832, 103 S.Ct. 73, 74 L.Ed.2d 71 (1982) ("It is well settled that the district court's equity jurisdiction em-

powers it 'to mould each decree to the necessities of the particular case.' *Hecht Co. v. Bowles*, 321 U.S. 321, 329 [64 S.Ct. 587, 591, 88 L.Ed. 754] (1944); *Electronic Specialty Co. v. International Controls Corp.*, 409 F.2d 937, 947 (2d Cir.1969).""). Additionally, to clarify the record, 729 F.2d at 107, the parties agree that Mid-Hudson has never sought JCAH accreditation and that BPC lost its JCAH accreditation, effective August 1984.

In the course of the hearings, apart from cross-examination, defendants presented no evidence. As a result, plaintiffs reason very simply that the Court of Appeals has adopted JCAH accreditation as *the* yardstick of constitutionally adequate care, and since BPC and Mid-Hudson are not JCAH accredited, these two factors establish a prima facie case of violation of plaintiffs' right to adequate treatment as recognized in *Youngberg, supra*. In turn, plaintiffs assert, that the prima facie case thus shifts to defendants the burden of demonstrating that BPC and Mid-Hudson nevertheless deliver constitutionally adequate care but since defendants have never attempted to satisfy that burden, plaintiffs are entitled to injunctive relief. This reasoning does not follow from the Court of Appeals opinion.

Recognition of JCAH accreditation as prima facie proof of adequate care merely allows plaintiffs to examine and probe the conditions of a JCAH accredited facility. In the context of litigation, the burden of demonstrating entitlement to injunctive relief rests upon the applicant, whom, as the Court of Appeals observed, may seek to establish, either in general or as applied to a specific facility, that JCAH standards are below constitutional benchmarks. 729 F.2d at 106. The Court of Appeals said nothing specific about the kind or quality of evidence necessary to establish a prima facie case of constitutionally inadequate care apart from a reference to the standard

---

1. Specifically, the Court of Appeals noted that remand was necessary for this Court to take evidence concerning South Beach Psychiatric Center in Staten Island. The parties report that that facility is currently JCAH accredited and HHS certified. Another facility mentioned by the Court of Appeals, Manhattan Psychiatric Center, has become the subject of a separate lawsuit in the Southern District of New York, and will be dealt with there.

enunciated in *Youngberg, supra.* In terms of its anticipation of further proceedings, inferentially relevant to this issue, the Court of Appeals did state,

> "In any event, we believe the entry of summary judgment, denying appellants [plaintiffs] an opportunity *to prove their allegations,* would be inappropriate as to that or any other institution losing accreditation or approval prior to final judgment." (Emphasis supplied)

729 F.2d at 107. This conclusion is consistent with the earlier statement that,

> "Although fully cognizant of the critical importance of the rights appellants [plaintiffs] seek to vindicate in this action, we are nevertheless persuaded that the district court was correct in holding that appellants had failed to assert an adequate factual basis for many of their claims. At the same time, we believe that the dismissal of certain claims was premature. Accordingly, we remand so that appellants may have an opportunity to document the constitutional defects they allege."

729 F.2d at 98–99.

■ In sum, the Court of Appeals did not decide the issue in plaintiffs' favor. On the contrary, the Court of Appeals, by its remand and opinion, has left it to this Court to determine the issue after a hearing in which plaintiffs would have the opportunity to prove their allegations and to document the constitutional defects they allege. Clearly, the absence of JCAH accreditation does not mean that the care rendered by a hospital is constitutionally inadequate.

To meet their burden of proof, plaintiffs called Dr. Henry Pinsker, Associate Director of Psychiatry at Beth Israel Medical Center in New York, as an expert (curriculum vitae, Pl. Exh. 15). He painted a harsh picture of the unaccredited institution. He noted that if his facility were to lose its accreditation, it would close in two weeks because third party payments (*e.g.,* Medicare and Blue Cross) would cease. Concerning the adequacy of medical care, he stated, "It's hard to imagine." He hy-pothesized nevertheless that an institution could be deficient in environmental areas (*e.g.,* fire hazards, dangerous conditions, poor heating) yet deliver adequate medical care, "but it might not be an adequate place for anybody to live." He opined that JCAH "bends over backwards" not to withdraw accreditation and that "some awfully miserable hospitals throughout the country have their accreditation."

Assuming the existence of a deficient environment, he testified that poor conditions would negatively affect patients. For example, individuals suffering from a chronic illness whose treatment is poor, are less likely to experience an improvement or periods of remission. He characterized descriptions of chronic schizophrenia in psychiatric literature as actually describing "chronic institutional care and understimulating environment." On cross-examination he reiterated that there is a possibility that a patient may be receiving satisfactory care in an unaccredited institution.

Also qualified as an expert (curriculum vitae, Pl. Exh. 3), Dr. Steven Rachlin, currently chairman of clinical services at Nassau County Medical Center, had once worked as a staff psychiatrist at BPC. He oversees a 90 bed JCAH accredited and HHS (Department of Health and Human Services) certified facility and has testified as an expert on individual treatment issues. He identified the JCAH manual, Pl. Exh. 4, and the Consolidated Standards manual, Pl. Exh. 5, which pertains more specifically to mental health facilities. These publications contain the standards against which JCAH measures the quality of a hospital's care for purposes of accreditation. He explained that the manual refers to "substantial compliance" because no one expects "perfection" or "100%". He also elaborated that the standards do not set a high level of care.

> "Q. To your mind, what kind of standards are they?
>
> "A. This is the minimal acceptable standards that a hospital or other facility ought to be able to comply with.

"Q. And if a hospital does not comply with those standards, sir, can it provide adequate patient care?

"A. Probably not."

Tr. May 15, 1985 at 82.

As Dr. Rachlin elaborated, accreditation occurs after a lengthy process in which a hospital is surveyed. *See Woe v. Cuomo,* 559 F.Supp. 1158, 1163–64 (E.D.N.Y.1983) (describing the JCAH accreditation process). The facility has advance notice of the visit by trained JCAH surveyors who meet with administrative staff and establish a schedule for observing programs and services and examining documents. A team of up to 5 individuals drawn from hospital related professions (*e.g.,* physicians, nurses, social workers, administrators, engineers) conducts an inspection over several days, gathering data for transmission to the JCAH staff in Chicago. The Board of Commissioners renders a final decision after reviewing the data. Accreditation may be granted with a contingency or contingencies, which are deficiencies from the standards. Such deficiencies are not serious enough to deprive the institution of accreditation but do require documentation of subsequent correction, alteration, or elimination.

After confirming that the cutoff of third-party medical services reimbursement follows on the heels of loss of accreditation, Dr. Rachlin added that the staff of an unaccredited facility suffers a loss of professional pride, the facility's residency training program is jeopardized, the dissemination of the event through the press damages the hospital's reputation, and most pertinent, relatives justifiably worry about the quality of care the patients are receiving.

The problem is especially acute for the involuntarily civilly committed patient, who is not in a position to select an accredited institution. Such individuals, who are part of the class the court originally certified in this case, enter a hospital for emergency care after evaluation by a physician and staff who have concluded that the individual meets the statutory criteria for hospital-ization. Involuntary civil commitments also come to a hospital from other hospitals on the certificate of two physicians. The receiving hospital evaluates the patient and determines whether to grant admission. In either case, patients are not advised of the accreditation status of the hospital they are about to enter.

Concerning BPC, Dr. Rachlin noted that the hospital had received three consecutive 1–year provisional accreditations. This indicates that JCAH has encountered a problem or problems of sufficient gravity to warrant a resurvey within one year instead of the usual three years. The shorter accreditation period permits the hospital to remedy the problem while enjoying the benefits of accreditation. A three year accreditation with contingency followed the one year accreditations. From the entire set of circumstances, Dr. Rachlin concluded that on their return, the surveyors had encountered similar problems. He summarized the findings, Pl. Exh. 1, as follows:

"A. I think the material from the Joint Commission specifies it specifically. They found significant difficulties in a variety of areas, including treatment planning, chart documentation, progress notes, discharge summaries, medical records, nursing staff, medical evaluations of patients, physical environment, life safety, a whole host.

"Q. And the JCAH is the standard professional body in the United States which evaluates whether patient care meets minimally adequate standards or not?

"A. They are so recognized nationally.

"Q. Doctor, you have your own opinion based on what you've seen as to whether or not the Bronx facility provided a minimally adequate care for the patients, don't you?

"A. Well, I would have to say based on the documentation available to me, that in all probability, they were not providing adequate care because they had so many problems."

Tr. May 15, 1985 at 104.

Examination of JCAH publications (manuals) for accreditation confirms the testi-

mony of Dr. Pinsker. There is no indication of just which criteria JCAH emphasizes as "bottom line" for accreditation and which criteria are more flexible depending on the circumstances and institution under consideration. On this point, Dr. Pinsker testified,

"A ... I might add, hospitals that I know of have been in danger of losing accreditation or lost it have usually had environmental problems, and also deficiencies in many aspects of care. The[y] are usually not maintaining proper records. They usually don't maintain proper supervision of staff. Professional staff. Non-professional staff. These are the things the commission tends to examine extensively. They look at the staff organization, and when accreditation is lost, there is usually—get at specific hospitals involved have not read their reports, but from what I know of hospitals that have had accreditation problems usually many aspects of care have been below par."

Tr. June 4, 1985 at 15–16. Although not emanating from JCAH, conceivably this testimony inferentially identifies factors emphasized in the accreditation decision; however, it still does not inform the Court just how much of which type(s) of deficiencies will be tolerated before JCAH refuses or revokes accreditation. Dr. Steven Katz, Commissioner of the Office of Mental Health, confirmed this point.

"[O]ne of the shortcomings of the Joint Commission, from its inception, has been that they set identical standards for all facilities regardless of their goals and missions. And it's all well meaning. It has had very good effects in some areas, and it has been disastrous in other areas because all systems were not geared to deliver the same kind of care as an acute hospital system, and they still aren't, and [I] said that it really has been in many cases kind of trying to put a square peg in a round hole."

Tr. June 5, 1985 at 10. He later added that after consultation with the industry, JCAH has realized that some of its standards need to be changed. Among the changes will be new standards for extended care facilities, which include many New York state mental hospitals.

The table of contents of the Consolidated Standards manual illustrates the comprehensive scope of accreditation. The standards, covering 35 categories, are grouped in four broad headings, *viz.*,

*Hospital/Facility management*—1. Governing Body, 2. Chief Executive Officer, 3. Professional Staff Organization, 4. Written Plan for Professional Services and Staff Composition, 5. Personnel Policies and Procedures, 6. Volunteer Services, 7. Fiscal Management, 8. Facility and Program Evaluation, 9. Quality Assurance, 10. Utilization Review, 11. Patient Care Monitoring, 12. Staff Growth and Development, 13. Research, 14. Patient Rights, 15. Patient Records; *Patient Management*—16. Intake, 17. Assessment, 18. Treatment Plans (four subheadings), 19. Special Treatment Procedures; *Patient Services*—20. Anesthesia Services, 21. Dental Services, 22. Dietetic Services, 23. Emergency Services, 24. Pastoral Services, 25. Pathology and Laboratory Services, 26. Pharmacy Services, 27. Professional Library Services (four subheadings); *Hospital Facility/Environment*—31. Plant, Technology, and Safety Management, 32. Therapeutic Environment, 33. Housekeeping Services, 34. Infection Control, 35. Sterile Supplies and Equipment.

They are followed by appendices, one of which explains the accreditation process from application through appeal.

Given the breadth of the standards, it is possible, as both experts testified, for an unaccredited facility to deliver constitutionally adequate care. The Court of Appeals implicitly recognized this reasoning when it observed that "loss of HHS certification may signal inadequate institutional conditions even where JCAH accreditation is in order." 729 F.2d at 106 n. 11. Unquestionably, however, the lenient manner in which JCAH applies its criteria, as evidenced by the testimony and the provision-

al accreditations extended to BPC over a four year period, reduces the chances of that hypothetical possibility in the case of an actual unaccredited hospital.

■ In determining proper injunctive relief, the Court cannot speculate as to what measures are necessary to bring a facility's quality of care up to constitutionally adequate standards. *Cf. Youngberg, supra,* 457 U.S. at 321–22, 102 S.Ct. at 2461. Before the Court may order the defendants to do anything (or cease from doing something), it must know about the conditions prevailing in the facilities at issue. It should know the standards that are in force, their origin, and the degree to which the standards are observed in practice. Informed of these factors, the Court may then determine whether the quality of care at an institution falls within the scope of professional acceptability or represents an exercise of professional judgment. *See Woe, supra,* 729 F.2d at 105–06 (discussion therein). Reports of surveys by accrediting agencies such as JCAH and HHS have been recognized as appropriate evidence of those conditions. *E.g., Woe, supra,* 729 F.2d at 106.

■ The evidence discloses that the quality of care at the Bronx fell below constitutionally adequate standards during the pendency of these proceedings. The deficiencies noted in the living conditions and therapeutic environment (including medical care) are by-products of chronic and persistent overcrowding documented in the record.

Pl. Exh. 7, a "Review of Living Conditions in Nine New York State Psychiatric Centers, May 1984", issued in December 1984 by the New York State Commission on the Quality of Care for the Mentally Disabled (hereinafter "Commission") is a copy of the Commission's final report on its survey of conditions at 9 hospitals, including BPC.[2] In May 1984 two commission staff members visited six randomly select-

ed wards at each facility for a three day period. Many of the findings are general and pertain to more than one facility. Specific observations at BPC are reproduced verbatim:

"*Bronx:* There was less than 18 inches between beds on all wards. On two wards, patients were lodged out to other wards because there were not sufficient beds. Dayrooms and dining halls were crowded and sometimes were without an adequate number of seats for patients. The effects of overcrowding on the quality of life for patients were only too apparent. The many beds, particularly in small dorms, which were only inches apart; the sheer number of patients wandering the halls and squeezing into dining rooms that could not accommodate the entire ward population at one time, left patients without a sense of their own space." [p. 10][3]

"*Bronx:* Many of the 24 sample patients were poorly dressed in shabby, mismatched, and sometimes ripped and ill-fitting clothing during the three-day period. Patients wearing pajama tops or bottoms instead of shirts or pants were not uncommon. Patients who did not bring personal clothing to the facility got the luck of the draw from the clothing room each morning. Others were wearing clothing that was not seasonal; for example, furry winter boots, a wool overcoat during our late May visit; and still others wore no underwear." [p. 15]

"[At Bronx] we observed wards where patients' clothes were stored under beds or piled on top of beds, chairs, or wardrobes for lack of storage space." [p. 16]

"[S]taff and patients on all six wards reported that toothpaste and toothbrushes were often unavailable." [p. 19]

"[T]oilet paper was lacking in some stalls of all visited bathrooms on all three days of the Commission's observations. In ad-

---

**2.** The establishment, function, and operation of the Commission on Quality of Care for the Mentally Disabled appear in L. 1977, c. 655, codified in N.Y. Mental Hyg. Law § 45.01 et seq.

**3.** Page references in brackets are to Pl. Exh. 7.

dition, paper towels were absent on five of the six Bronx wards." [p. 21]

"*Bronx:* Some bed linens on some beds were missing on all wards. Some beds had only one sheet, and on four wards some beds lacked pillows or pillowcases. Shabby, worn bedspreads/blankets lent a dismal ambiance to dormitories. A towel scarcity was reported by staff and patients. Patients, except on laundry day, often used sheets instead of towels for drying." [p. 24]

"Dayrooms, dormitories, and bathrooms of all six wards were generally dirty. Floors needed mopping and were often littered with cigarette butts and scraps of paper. Shower stalls and benches were mildewed or caked with bits of dried soap. Radiators throughout had been stuffed with paper scraps and cigarette butts; and wall fans were dirt encrusted. Seclusion rooms at the Bronx were especially filthy, with urine on the floors of some and others reeking with urine." [p. 29–30]

"[O]ne ward was reportedly infested with lice, as well as roaches and mice." [p. 32]

"Wall and ceiling maintenance was also a serious problem at Bronx Psychiatric Center. Most areas on five of the six wards visited at the Bronx required repainting." [p. 34]

"[A]ll wards visited had at least one plumbing problem, ranging from toilets which would not flush to some sink faucets which were inoperable to plumbing leaks resulting in water on the floors." [p. 37]

[Report specifically notes fire safety problems at p. 45]

"[A]vailable supplies in wards' first aid kits varied substantially, and staff generally were confused as to the facility's policy for what constituted required first aid supplies." [p. 47]

"Bathroom privacy ... was also lacking with several or many toilet and shower stalls without doors or curtains." [p. 55]

"Most patients' wardrobes at all facilities were unlocked and/or unlockable. At three facilities, Manhattan, Bronx, and Kingsboro Psychiatric Centers, this problem was so significant that patients were discouraged from keeping any personal belongings, including clothing, on the wards." [p. 58–59]

From the context of the report, it is apparent that the surveyors also found other deficiencies, *e.g.*, "At all nine visited facilities many of the basic amenities of daily living that we all count on were absent—clocks, calendars, posted schedules, free access to drinking water." p. 60, which are noted specifically in a report issued April 18, 1985 by Deborah Blessing, Assistant Director, Quality Assurance Bureau, Pl. Exh. 8.

After receiving the report from the May 1984 survey, the Office of Mental Health (OMH) submitted responses in the nature of corrective actions designed to alleviate the noted problems. Specifically referring to BPC, OMH stated,

"[R]enovations underway at Bronx (requiring one-fourth of the facility be vacant for construction work at all times) have necessitated an even further reduction in patient census until renovations are completed. OMH with an agreement with New York City Department of Mental Health is providing intermediate/long-term care to certain groups of Bronx residents in Rockland PC. To date, 47 Bronx residents have been admitted to Rockland."

The Commission on the Quality of Care resurveyed BPC in February 1985 and issued a report, Pl. Exh. 8, reviewing the findings of the May 1984 visit followed by comparison to the findings of the February 1985 visit. In the February 1985 visit, the surveyors also visited two additional wards which had not been part of the prior survey. The findings for those two wards are noted separately. In general, the report praises the efforts that were made to make BPC a more "humane" institution; however, there were still problems with overcrowding, patient clothing, insufficient bed and bath linens and personal hygiene supplies, vermin infestation (cockroach), attrac-

tiveness of visiting rooms, control of temperatures on the wards (report notes installation of a new heating system), and patient idleness.[4]

As its report states, the Commission surveyed only the living conditions at the facilities with 100 of 130 items taken directly from JCAH standards. In comparison, JCAH standards, Pl. Exhs. 4 and 5, and HHS certification regulations, 42 C.F.R. 405.1020 *et seq.*, are much broader in scope. The findings of the Commission's surveyors document the Bronx's continuing and persistent inability to meet professionally acceptable standards.

In December 1984 the Department of Health and Human Services surveyed BPC to determine if the facility were eligible to participate in the Medicaid program despite its lack of JCAH accreditation. This 42 page report, issued November 1985, lists noncomplying conditions in nine broad categories—Governing Body, Physical Environment, Medical Staff, Nursing, Dietary, Medical Records, Medical Library, Social Work, and Special Medical Records. A resurvey on July 15, 1985 disclosed that of the nine categories only Medical Staff and Social Work had been brought into compliance. Among its highlights, the resurvey revealed 18 deficient conditions (not in compliance with the state sanitary code) in the rehabilitation cafeteria and that the Executive Director, Dr. E. Richard Feinberg, who testified in these proceedings, had not established adequate accountability procedures for departments that had been cited for deficiencies in the first survey. The lists cover from floor to ceiling and from medical care to the condition of one building's roof. Some of the fire hazards stemmed from the facility's pre-code construction; however, others regarding portable fire extinguishers, evacuation instruc-

tion, the alarm system, smoke detectors, and the regulation of smoking were repeat deficiencies. Given the obvious inability of many of the patients to care for themselves, the potential for a catastrophe from a fire is apparent; consequently, strict adherence to precautions against loss of life from fire is imperative. The survey notes improper storage of perishable foods, which creates the potential for waste and illness. The quality of medical care was also not comforting. The facility provides no adequate isolation rooms for housing infected patients and has no written policy for reporting infectious cases to the health authorities. Numerous deficiencies were noted in patients' medical records. In addition to failure to record vital signs in several instances, there was no documentation of observations for a least one patient placed in seclusion and no documentation of observations for 3 days prior to another patient's death. Further, medications and treatments were not administered as ordered by physicians. Most significantly, the 583 bed capacity established by the Office of Mental Health had been exceeded in every month of 1985 as follows: January —630; February—660; March—670; April —665; May—655; June—660; July—669.

Although Dr. Rachlin testified that every facility tolerates a certain amount of overcrowding, Tr. May 16, 1985 at 135, BPC has been continuously overcrowded since 1983 at the very least. As demonstrated by the evidence, this overcrowding stems in part from demands placed upon BPC as well as from the intent of management.

"Begun in April, 1983 and continuing thru March, 1986 a major program of renovation has been designed to improve substantially the quality of patients' lives by altering living space in the direction of creating more privacy, by upgrading the ventilation and heating system, by

---

**4.** During the testimony of Dr. Katz, there was heated discussion concerning the nature of and extent of any negotiations between the Commission on Quality of Care and the Office of Mental Health. Plaintiffs only inferentially suggested that the Office of Mental Health had sought to influence the Commission's findings, which were critical and sweeping. Regardless of any

possible interaction between the two agencies, in light of the JCAH and HHS surveys, which are lengthly itemizations of the observed deficiencies as opposed to the Commission's narrative style of reporting, plaintiffs had a constitutional right to better treatment and conditions than defendants were providing.

the addition of air conditioning and by the replacement of defective windows. A census reduction of 120 (two-thirds by transfer to other psychiatic centers) was necessary in order to meet the contractor's need to have 25% of patient care space empty at all times during the process.

"This temporary situation, although proceeding according to schedule, has resulted in a lack of flexibility as regards the use of patient care space, one result of which is overcrowding and lack of privacy. The rate of progression of the project is contractually fixed and cannot be altered."

Pl. Exh. 1 at 273 (letter of Dr. Feinberg of February 20, 1974 to Dr. Myrene McAninch, director of Accreditation Program for Psychiatric Facilities, JCAH, concerning BPC's appeal).

As the HHS survey demonstrates, the census reduction was apparently never accomplished, a not unsurprising result in light of the evidence of the staggering demands placed on BPC. For purposes of the examination of Dr. Feinberg, the length of patients' stays was divided into short term admissions (less than 90 days), intermediate admissions (90 days to 1 year), and long term admissions (more than 1 year). Dr. Feinberg testified that in 1984 10% of all admissions were short term and approximately 40% were intermediate. Tr. May 16, 1985 at 175. Although the question was not asked, it would appear that the remainder of admissions, approximately 50%, are long term. Despite this profile of extensive utilization (almost 1 in every 2 patients admitted will still be there during the entire year following admission), according to Dr. Feinberg, BPC manages to discharge almost as many patients as it admits. Tr. May 16, 1985 at 170. Pl. Exh. 1 at 478 shows 1048 admissions and 811 discharges in fiscal year 1983–84 and 1155 admissions and 835 discharges in fiscal year 1982–83. Dr. Pinsker testified that his phenomenon may be attributed to pressure from "Albany" (OMH) or as a response to ease overcrowding. Tr. June 4, 1985 at 43.

In theory, defendants are attempting to keep apace of this demand. On August 21, 1985, when the census was at 670, approximately 90 above the goal of 580 set by OMH, a 60 bed unit at a division of Catholic Charities was in the process of development and efforts to transfer 30 patients to another facility were also being made. As a result, after accomplishing these tasks at some unspecified time in the future, the census should drop to 580. The record contains no confirmation that in the interim the census has actually decreased to 580, which Dr. Feinberg characterized as optimal. The basis for labeling 580 optimal was not fully developed except that in computing the figure, OMH had taken the renovations into account. Earlier, Dr. Feinberg had stated that 700–710 "is the most number of beds that you can physically put in there." Tr. May 16, 1985 at 170. After renovations, capacity would be 750. Despite calling 580 optimal, both Drs. Katz and Feinberg agreed that BPC is overcrowded. This concession, coupled with the Commission's findings about overcrowding, sustains the inference that BPC can accommodate the number of patients OMH has determined is "optimal" only by lodging patients in areas not intended for sleeping quarters. That arrangement reduces the space available for treatment programs and suggests a policy of warehousing and containment rather than rehabilitation, which is the hallmark of the patient's right to adequate treatment.

Despite decreased capacity, BPC continued to relieve municipal hospitals in the Bronx of psychiatric patients pursuant to a "trip-wire" agreement. As Dr. Katz explained, under the agreement in the Bronx, when a municipal hospital's psychiatric service, *e.g.*, North Central Bronx, is full (contains the number of patents stipulated in the agreement), additional patients are transferred to BPC. Pl. Exh. 14 at 54 shows a total of 586 transfers to BPC from November 1981 to August 1983. Dr. Katz testified that, "We are diverting 380 a year plus the transfers." Tr. June 5, 1985 at 89.

He also agreed that there was a need for more psychiatric beds in Bronx County, and further stated, "It's still an absolute necessity. There are plans to begin exploring when [the trip-wire agreement] can be removed as the system becomes more comprehensive and is able to handle the flow of patients." Tr. June 5, 1985 at 88.

"For the issuance of a preliminary injunction in this Circuit, the moving party has the burden of showing:

'(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary injunctive relief.' *Kaplan v. Board of Education of the City School District of the City of New York*, 759 F.2d 256 (2d Cir.1985)."

*Loveridge v. Pendleton Woolen Mills, Inc.*, 788 F.2d 914, 916 (2d Cir.1986).

■ The evidence compels the conclusion that overcrowding at BPC has adversely affected the quality of care delivered to patients at least to the degree that, as plaintiffs contend, the burden of proof has shifted to defendants to demonstrate that the Bronx meets constitutionally adequate standards despite the lack of JCAH accreditation. The involuntarily committed patient has a right to decent and humane conditions, *Society For Good Will To Retarded Children v. Cuomo*, 737 F.2d 1239, 1243 (2d Cir.1984), and the uncontradicted evidence reveals that those conditions have not been observed at the Bronx. *See Eckerhart v. Hensley*, 475 F.Supp. 908, 916–19 (W.D.Mo.1979); *see also Davis v. Watkins*, 384 F.Supp. 1196, 1203–12 (N.D.Ohio 1974) (setting out "minimal constitutional standards for adequate treatment for patients committed to Lima State Hospital", many of which standards are not met at the Bronx).[5] Given defendants' demonstrated inability over 2½ years to accomplish the 120 patient reduction required by the renovations, their good intentions do not persuade the Court to give them more time to cope with the problems at BPC entirely at their own discretion.

In *Society, etc., supra*, the Court of Appeals ruled that residents of schools for the

---

5. Defendants assert that "plaintiffs were unable to show any correlation between census and the provision of adequate treatment." Defendants' post hearing brief at 8. They rely on Dr. Feinberg's testimony that the Bronx has a capacity of 710 and Dr. Rachlin's testimony on cross-examination as follows,

"Q You have spoken of those instances in which patients are deflected or transferred to other accredited facilities or care in lieu of being in overcrowded or otherwise unacceptable facilities. What happens to the patient who isn't admitted at all because there is no admission into an unaccredited facility due to a stay, but who needs care?

"A He [or] she would be diverted to another hospital., I'm not sure I understand your question.

"Q I'm sorry. Assuming that other hospitals are at capacity, and assuming that there were no further admissions to Bronx Psychiatric Center, for example, what would happen to the patient who can't get into Bronx Psychiatric and for whom there's no capacity in any other state facilities?

"A You mean the balloon is going to burst?

"Q Yes.

"A Again, I've lived through such situations. Each facility takes a certain percentage of overcrowding and lives with it.

"Q. Isn't it a fact that a certain amount of overcrowding is livable.?

"A A certain amount is livable.

"Q And adequate care can be delivered at a facility notwithstanding a certain degree of overcrowding?

"A Well, when, for example, my own unit was overcrowded five years ago or so, as I talked about yesterday, and I learned on the State to take some patients, it was quite simply I felt we weren't doing a decent job.

"Q How overcrowded were you at that point?

"A 20, 25 percent

"Q But it was not until you reached a 20 or 25 percent level of overcrowding that you called for help, so to speak?

"A My balloon burst when people are sleeping in hallways."

Tr. May 16, 1985 at 134–35. The Court infers that the duration of overcrowding at Dr. Rachlin's 90 bed facility was relatively brief, in part because he had an alternative placement for patients. By comparison, plaintiffs at BPC, a much larger facility, have been attempting to sleep, eat, shower, and recover in much closer, less well appointed quarters for almost 3 years.

mentally retarded have rights at least as great as those of prisoners. From the context of this statement, wherein the Court of Appeals also acknowledges that the mentally retarded resident may not be punished, the Court infers that the mentally ill patient has rights greater than a prisoner's, or more accurately, different than a prisoner's. At least one Court has characterized these rights as a humane and therapeutic environment, qualified staff in sufficient numbers, an individual treatment plan for each patient and planned therapeutic activities and programs. *Rone v. Fireman*, 473 F.Supp. 92, 119 (N.D.Ohio 1979). In his testimony of May 15, 1985 at 91–92, Dr. Rachlin agreed with these standards. The record discloses an environment which is not humane or therapeutic, no direct evidence of the adequacy of staff, except that deficiencies attributable to staff suggest inadequate numbers or inadequate training, both of which the Court has the power to remedy, *Davis v. Balson*, 461 F.Supp. 842, 857 (N.D.Ohio 1978), the absence of individual treatment plans for some patients, and the presence of some therapeutic activities and programs (Pl. Exh. 1 at 278–80 and 296–305).[6]

Given the history documented in the surveys, it seems unlikely that BPC can furnish a humane and therapeutic environment as long as it remains overcrowded. Defendants' alternatives, which include seemingly drastic measures intended either to discourage admission or encourage discharge, Pl. Exh. 19 (goals and objectives to reduce and maintain the census at 580 in 1985–86), have not eased the burden or raised the quality of care to satisfy constitutionally adequate standards. Consequently, as an initial step toward improving the quality of care, the population at BPC must be reduced. To the extent that defendants attempted to reduce the number of patients, they had not succeeded in the

endeavor by August 1985. Additionally, although vital renovations were scheduled for completion in March 1986, despite the pendency of these proceedings beyond that time, defendants have submitted nothing concerning the status of the renovations nor their effect upon the quality of care.

Consistent with the admonition in *Society, etc., supra*, 737 F.2d at 1251, defendants will be given an opportunity to comply with an injunction geared toward remedying a specific constitutional violation prior to more drastic action. Accordingly, within ten (10) days of the date of this order, defendants are enjoined from admitting any additional patients to BPC. The ten day delay in the imposition of the injunction will afford defendants an opportunity to seek a stay from the Court of Appeals pending appeal. Once the injunction is operative, the Court will consider its extension every 30 days based upon evidence of defendants' progress.

According to Dr. Rachlin, "closing the gate" will improve care immediately because as the patient/staff ratio decreases, the time available for staff to attend to each patient increases. This measure is also intended to allow defendants to focus their efforts toward restoring BPC without having to be distracted by the demand of how to respond to and where to place the multitude of new patients. At the outset, the reduction will be accomplished by natural attrition of the patient population, *i.e.*, discharges in the ordinary course of the hospital's operations. On the basis of past rates of discharge, the census should be reduced by at least 60 patients in the first 30 days. Pl. Exh. 1 at 275. This reduction will permit the staff and management to concentrate on augmenting structures and implementing standards so that BPC can deliver constitutionally adequate care to the population it has been designated to serve.

---

**6.** While this Court is in no position to run a mental hospital, *Eckerhart, supra*, 475 F.Supp, at 915, it cannot ignore the implications of evidence showing plans of corrective action followed by seemingly unsuccessful results. For example, in the appeal to the JCAH Dr. Feinberg lists several steps to remedy problems in nursing care along with completion dates in 1984, plaintiffs' exh. 1 at 310–14; yet, the HHS survey in July 1985 lists deficiencies on pp. 40–42 attributed to the nursing staff.

In entering the above order, the Court recognizes that it has not yet made a finding that irreparable harm flows from an involuntarily civilly committed patient's subjection to constitutionally inadequate care.

" 'Irreparable harm' means injury for which a monetary award cannot be adequate compensation. *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d [70, 72 (2d Cir.1979) (per curiam) ]." *Kamakazi Music Corp. v. Robbins Music Corp.*, 534 F.Supp. 57, 68 (S.D.N.Y.1981); *accord Sperry International Trade, Inc. v. Government of Israel*, 670 F.2d 8, 12 (2d Cir.1982). Inasmuch as "[t]he patient committed against his will has a *constitutional* right only to that treatment as is minimally adequate to provide him a reasonable opportunity to be cured or to improve his mental condition", *Eckerhart, supra,* 475 F.Supp. at 915, and as Dr. Pinsker testified, a deficient quality of care adversely affects the patient's opportunity for improvement, the loss occasioned by a violation of the constitutional right to adequate treatment is not susceptible of monetary evaluation. *See Illinois Migrant Council v. Pilliod,* 540 F.2d 1062, 1071 (7th Cir.1976), *modified on other grounds,* 548 F.2d 715 (7th Cir.1977); *Tully v. Orr,* 608 F.Supp. 1222, 1225 (E.D.N.Y.1985); *see also Northern Penna. Legal Services, Inc. v. County of Lackawana,* 513 F.Supp. 678, 685 (M.D.Pa 1981) ("Violations of a litigant's constitutional rights constitute 'irreparable harm' *per se.*").

Furthermore, to continue to characterize these proceedings as an application for a preliminary injunction misperceives the record and the nature of the Court of Appeals remand. Contrary to an erroneous assumption contained in defendants' posthearing brief at 8, this Court did not take evidence and require the production of witnesses in order to hold the trial on the merits at some future date. Conditions at a given institution may not be stagnant as evidenced by the fact that the director at BPC had proposed corrective actions or plans for almost all of the deficiencies noted in the aforementioned surveys. At trial, he specifically related changes made in response to JCAH criticisms. Tr. May 16, 1985 at 181–94 and 202–03. He has established more and better functioning treatment teams with the goal that the team leader will better document the patient's progress notes. To remedy problems with discharge summaries, he instituted supervision of the employees preparing the summaries. This supervision includes counseling of personnel who prepare defective summaries. He reestablished the position of Director of Nursing and hired 25 staff nurses (5 have since departed, 2 by discharge) and is about to hire 12–20 more nurses through an agency that has contacts with a school in the Philippines. After August 1, 1984 only registered nurses may administer medications. Approximately half of the patients have benefitted from new privacy policies designed to segregate bathroom areas by sex. Supervision of the housekeeping staff has increased. The renovations will bring air conditioning and a new heating system to 350 beds. The ventilation system for the remaining 350 is only being repaired.

Because Dr. Feinberg was unable to give an accurate account of the uncompleted proposals, he offered to return after consulting with his subordinates. His subsequent testimony partially diminished the curative effect of his prior accomplishments and shed some light on the exact nature of the problem he faces. The issue concerned the appropriation of money to run BPC. Dr. Feinberg explained that he will receive an appropriation for the current population along with "a statement that says by such and such a time your population has to be at a predetermined number." Tr. Aug. 20, 1985 at 13. By March 21, 1986, the population was supposed to be 600, a number which the Court believes is unrealistic in light of the consistent 1985 populations. Plaintiffs' counsel attempted to learn what would happen to the size of the appropriation if the population goal were not met. At first, Dr. Feinberg insisted that everyone would be taken care of, but finally he stated,

"If I find that I am running short, then I have to justify why I need more resources and if that's justification that's adequate, then I will get it."

Tr. Aug. 20, 1985 at 16. Regrettably, defendants' counsel never clarified the matter; consequently, the record permits the inference that budgetary constraints may either reduce the ameliorative impact of Dr. Feinberg's changes or otherwise force him, or any other director of the hospital, to alter those changes.

While Dr. Feinberg's testimony may constitute evidence of the extent to which changes were effectuated, he did not relate whether those changes were effective, *see Clark v. Cohen,* 613 F.Supp. 684, 707 n. 17 (E.D.Pa.1985), except that BPC is not yet ready for a reaccreditation survey. Under these circumstances, the Court finds that Dr. Feinberg's testimony does not rebut the undisputed evidence of BCP's continuing inability to pass inspection accompanied by persistent overcrowding. *Cf. Flakes v. Percy,* 511 F.Supp. 1325, 1340 (W.D.Wis. 1981); *Eckerhart, supra,* 475 F.Supp. at 915 ("[I]t is the duty of this Court to inquire whether the practices or conditions in a particular institution violate constitutional prohibitions or fail to provide what may be constitutionally required.").

Apart from specific corrective responses, Dr. Katz related the broader perspective of change at BPC.

"A. So, what we have done is try to [integrate] Bronx Psychiatric into the system as a whole, which is the only way we are ever going to solve these problems in toto. And what that meant was more aggressive management, changing the relationship to the medical school, firing 14 doctors, and replacing them with younger people who have [a] different philisophy of treatment, lowering the lengths of stay, hiring new nurses, transferring 300 plus patients a year to Rockland before they get to Bronx State, until we finish the renovations ... And begin to set up a philisophical value system in that hospital that moves towards a different kind of care, the problem areas, and the reason it takes time is because it's reversing an approach to treatment that's been in place there for 30 years. You need to make significant changes. You need to also build the network in the Bronx, because you have the least facilities in the Bronx, and the least disposition places to send patients. So that, it takes time and it's an entire system problem."

Tr. June 5, 1985 at 78–79.

As already noted, the results of the July 1985 HHS survey do not suggest that these changes, nor those recited by Dr. Feinberg, have eliminated the problems. As a result, and despite their seemingly bonafide efforts, the record requires defendants to demonstrate when they intend to bring the quality of care at the Bronx up to constitutionally adequate standards.[7] The record also convinces the Court that defendants must have some assistance in the nature of a temporary population reduction to return to the delivery of constitutionally adequate care in an expeditious manner. As one judge has observed,

"As long as there are present ongoing violations of plaintiff's constitutional rights, *prospective* equitable relief ... is certainly a proper remedy."

*Clark, supra,* 613 F.Supp. at 706 (emphasis added).

Of course, due to the passage of time during the pendency of this motion, defendants must be given an opportunity to demonstrate that they have succeeded in reme-

---

**7.** On cross-examination of Dr. Rachlin, defendants emphasized the factor of time. Tr. May 16, 1985 at 143–45. In a series of leading questions, their counsel noted the existence of money in the state budget to convert medical/surgical beds to psychiatric beds. Obtaining the required certificate of need for these beds from the Federal Government, however, is a time consuming process, which Dr. Rachlin admitted, "gets bogged down in bureaucracy". In his testimony, Dr. Katz also stressed that it takes time to make changes at BPC due to the system-wide nature of the reforms. On the basis of the record, plaintiffs have waited sufficiently long enough to reap the benefits of change that due process requires more accountability from defendants than, "You have to understand, it takes time."

dying conditions which prevent BPC from delivering constitutionally adequate care. *See Davis, supra,* 461 F.Supp. at 848. Whether this opportunity will be in the form of a hearing in open court or on the submission of papers or both shall be determined within 20 days of this decision.

In considering their response, which may well include evidence that at the present time BPC is ready for and/or awaiting the results of a resurvey by the JCAH, defendants are reminded of this Court's findings in a suit challenging conditions at Creedmoor State Hospital.

> "JCAH's ordinary accreditation procedures incorporate a thorough review of an institution, and defendants have submitted affidavits documenting the specific expert inspection conducted at Creedmoor. JCAH's governing body and membership are doctors and experts; *no panel of experts that this court might appoint could better determine whether Creedmoor provides adequate care.* Moreover, each of the specific institutional inadequacies alleged in the complaint is addressed by one or more of the JCAH criteria."

*Concerned Citizens For Creedmoor, Inc. v. Cuomo,* 570 F.Supp 575, 576–77 (E.D.N.Y.1983) (emphasis added).

Perhaps anticipating the Court's view of the evidence, defendants have presented arguments relevant to the effects of an injunction and their inability to comply with what they perceive to be plaintiffs' proposed relief. Plaintiffs anticipate that the surplus of patients at BPC will be diverted to a surplus of hospital beds located in proprietary hospitals, *e.g.,* Montefiore, in Bronx County. As Dr. Katz explained, he has no power to commandeer such beds for state use. Tr. June 5, 1985 at 120–121. He also related the time consuming and bureaucratic process involved in converting medical/surgical beds to psychiatric beds, assuming that a proprietary hospital were willing to engage in the necessary alteration and to accept the patients.

Defendants further fear that the surplus will back-up into overcrowded psychiatric wards at municipal hospitals in the Bronx and other state facilities already operating at capacity. Consequently, "It is not in the public interest to leave these individuals without a place to go for treatment, or to exacerbate potential overcrowding at other facilities by diverting them to other hospitals." Defendants' post-hearing brief at 16.

In assessing these claims, the Court cannot agree with defendants that the record lacks evidence of inadequate care at the Bronx. The conditions described in the surveys evidence a deficient level of care, and the record is not bereft of alternatives to plaintiffs' hospitalization in the Bronx. Dr. Rachlin explained that transfers back and forth between his hospital and Pilgrim State Psychiatric Center are common. Usually he sends patients who require long term care to Pilgrim, and Pilgrim sends patients to him on the basis of clinical characteristics. Dr. Rachlin also related a case in which he had relieved Pilgrim during an emergency situation.

> "There was a couple [of] occasions where the State had an early retirement incentive whereby an unanticipat[ed] large number of State employees took an early retirement option. Pilgrim then felt the necessity to regroup, to regroup their staffs, their patients, to assess the damages; as it were of the early retirement program, and asked that for a period of several weeks I take all admissions from Nassau County and send no one to Pilgrim Psychiatric Center. It seemed a reasonable thing to do. If a facility needs to regroup and get itself together again, it's a little bit tough to do that when you have a constant parade of very sick people coming in who you have to take care of. For that three-week period, we sent no one to Pilgrim. We admitted them all to Nassau County Medical Center. We got a little bit overcrowded doing it, but the overall patient care in Nassau County benefitted.
>
> "Q. ... How did the closing of the gates at Pilgrim help it during the regrouping period?

"A. Let me reiterate what I said. It's a little bit difficult to try and figure out where all the patients should go and where all the staff should go when you have a constant pressure of new and very sick people who need immediate care and attention. It's an ultra-short term goal to take care of a patient and a short term goal to reorganize, and to reassign staff and to reassign patients to different wards. And it's very diffcult, if not impossible, to do both at the same time. It was my feeling that if I gave them some breathing space, we would all be the better for it, especially patients."

"Q. And that is what happened?

"A. That's what happened."

Tr. May 15, 1985 at 109–11. Even BPC had provided a similar service for Central Islip Hospital in the early 1970's because,

"... one of the buildings at Central Islip had deteriorated to the point where it was uninhabitable because of fire safety or some other problems with the building, not with the patients or facility accreditation. But those people had to go someplace, because it was no longer safe for them in that building at Central Islip."

Tr. May 15, 1986 at 113. Dr. Rachlin added that these transfers were accomplished with considerable forethought.

Defendants have presented no evidence that they exercised similar forethought prior to renovating BPC beyond arranging some transfers to Rockland Psychiatric Center. Nothing in Dr. Katz's testimony contradicts Dr. Rachlin's testimony that,

"The Commissioner of Mental Health can apply some gentle muscle to some other general facilities in the area to help out and take extra patients from time to time. I certainly know that to occur and used the mechanism myself."

Tr. May 16, 1985 at 130–31.

While there is considerable reference to a hospital's catchment area, the geographical area for whose residents the hospital is responsible, and the desire to permit patients to be visited by relatives, there was no discussion concerning temporary transfer of long-term or longer-term patients who had become disconnected from the community. Dr. Rachlin explained that the staff could match a set of criteria to patients who were no longer visited or no longer had contact with relatives, and who were unlikely to be discharged in the foreseeable future. Ostensibly, this process would permit transfers of patients to hospitals located further from the Bronx than Rockland Psychiatric Center. Assuming that the number of patients satisfying the criteria was relatively small, defendants still have not explained why they did not transfer patients for 30 or 60 days to permit a period of intensive and complete overhaul at BPC after which the patients would return. The record of deterioration of care at BPC compels the conclusion that despite their efforts, defendants failed to manage a crisis which they should have anticipated. See Pl. Exh. 14 (Final Report of Governor's Select Commission on the Future of the State-Local Mental Health System, issued November 1984).

■ Although the possible alternatives may influence the nature of the relief ordered, the violation of plaintiffs' constitutional rights does not hinge on the presence or absence of alternatives. *See Benjamin v. Malcolm,* 564 F.Supp. 668, 688 (S.D.N.Y. 1983). Having undertaken to provide governmentally mandated care and treatment to the involuntarily civilly committed patient, defendants must provide constitutionally adequate treatment. They are not relieved of this responsibility by protesting, in essence, that resources, either monetary or creative, are so scarce that inadequate care in BPC is preferable to no treatment at all. *See Thomas E. by Brooks v. Morrow,* 601 F.Supp. 1055, 1059 (W.D.N.Car. 1984), *aff'd* 781 F.2d 367, 375 (4th Cir.1986) ("Lack of funding or of established alternatives is not a factor which may be considered in determining the scope of this constitutional right."); *Lapeer Oakdale Parents Ass'n, etc. v. Ochberg,* 492 F.Supp. 1035, 1037 (E.D.Mich.1980) ("*It is also clear that budget cuts cannot under any circumstances justify depriving the resi-*

*dents of their rights."* (original emphasis)); *cf. Clark, supra,* 613 F.Supp. at 707 ("[D]efendants argument that funding constraints should prevent this court from ordering the relief sought by plaintiff is contrary to logic and law.").

■ To receive the deference accorded "professional judgment", as derived from *Youngberg,* "the decision must be one based on medical or psychological criteria and not on exigency, administrative convenience, or other non-medical criteria." *Clark, supra,* 613 F.Supp. at 704. In *Clark* the court rendered this statement in the context of a mentally retarded patient's claim for individual relief. In this case, both this Court and the Court of Appeals applied the *Youngberg* criterion, which formulated a standard for the individual plaintiff's lawsuit, to a lawsuit initially challenging statewide standards and now apparently challenging institution-wide standards. Analogously, therefore, in the institution-wide setting, the quality of care delivered at BPC must be measured by medical or psychological criteria and not by exigency, administrative convenience, or other non-medical criteria. Defendants cannot justify inadequate care at BPC on the ground that they are preventing similar inadequacies from spreading to other institutions. *Cf. Benjamin v. Malcolm,* 528 F.Supp. 925,

930 (S.D.N.Y.1981) ("[W]hat the State proposes here is to equalize unconstitutionality by requiring the City to share the burden of impermissible overcrowding with the State. The remedy does not lie in equalizing unconstitutionality but in eliminating it.").

In contrast to the voluminous quantity of paper relating the recent history of care at BPC, the record contains almost no evidence of the quality of care at Mid-Hudson. Ironically, because defendants have not offered Mid-Hudson to JCAH for accreditation, they have only partially prevented plaintiffs from discovering the standards governing quality of care at that institution and whether those standards are in fact implemented.[8] Undaunted, plaintiffs' attorney represented in open Court that he premised his application on the lack of JCAH accreditation, Tr. May 17, 1985 at 302; Tr. June 5, 1985 at 132, a position this Court treated with skepticism at that time. The Court has explained above why it does not accept plaintiff's position; nevertheless, some evidence about Mid-Hudson was presented.

The hospital's description is set out in N.Y. Admin. Code tit. 14 § 57.1:

"The Mid-Hudson Psychiatric Center is a hospital in the Department of Mental Hy-

---

8. The Court has not overlooked plaintiffs' exhs. 20 and 21, listing some 51 manuals covering BPC, of which plaintiffs' exh. 19 is the Hospital Policies and Procedures Manual, and plaintiffs' exh. 16, which is the policy and procedures manual for Mid-Hudson. The existence of standards in the abstract, however, does not insure their implementation as evidenced by the following excerpt from plaintiffs' exh. 10 (memorandum of deputy executive director P.M. Haeberle), an account of the visit of a member of the Board of Visitors to BPC on April 28, 1985.

"When entering the building she found the lobby to be filthy far more cluttered and dirty than her recent inspections. But unlike on previous times the patients were inappropriately clothed.

"She then went to Ward 30 where she found Frederick Henry not being on one to one and his room not clean. Clothing was all over the floor and stacks of used plates and eating utensils also. Mr. Henry had not taken a shower. In addition he was crying, claiming that staff would not let him out of the room.

"In discussions with the staff Mrs. Rosello found them to be pleasant; however stating that they were not going to watch Mr. Henry even from the hallway that 'they had children at home to worry about.' The staff said that they were not going into the room to take away the dishes and that someone else should do it.

"When questioned about the showering of Mr. Henry then they stated that they were not doing that.

"In addition there was a patient by the name of Mark, who supposedly has Hepatitis, and who is being more unmanageable because staff is having no relationship whatsoever with him.

"She then went to Ward 29 where she found that there were two female Therapy Aides scheduled on duty and only one showed up and one of the Therapy Aides from the previous shift would be starting at 4:30. Thus leaving one female staff member on a crowded ward of males."

giene which offers a range and variety of programs and services for the care, treatment, and rehabilitation of the mentally ill of the age of 16 and over comparable with those offered at other hospitals in the department. In addition, it has the staff and physical surroundings to enable it to offer such programs and services to patients requiring closer supervision than can be given at other hospitals. Patients whose behavior is such as to raise the likelihood of their causing harm to others cannot be given care and treatment they require at such other hospitals since, for the protection of other patients and staff of such hospitals, they must be kept in closed wards and even in seclusion. The Mid-Hudson Psychiatric Center with specially trained staff and perimeter security permits freer movement within institutional grounds, of such patients and the possibility of rehabilitation, recreation, and therapies which, because of their need for close supervision, would not be available for them at the other hospitals."

Primarily for the criminally insane, the hospital does admit involuntary civil patients by transfer. The procedure for the transfer is contained in § 57.2, which requires findings that,

"(1) there is a substantial risk that such patient may cause physical harm to other persons, as manifested by homicidal or other violent behavior by which others are placed in reasonable fear of serious physical harm.

(2) reasonable efforts at treatment have been made without eliminating such substantial risk of physical harm to others.

(3) the patient needs the close supervision provided at the Mid-Hudson Psychiatric Center."

Dr. Ordogan Tekben, director of Mid-Hudson, testified that of some 360 patients in the hospital on May 16, 1985, approximately 20 are involuntary civilly committed patients who were transferred from other hospitals. Unfortunately much of the examination of Dr. Tekben concerning the other categories of admissions was unfruit-

ful, revealing little of relevance about the quality of care except that patients are not segregated by category of admission and new admittees are not informed of the hospital's unaccredited status.

JCAH accreditation has been discussed among Dr. Tekben and other Office of Mental Health officials. See Pl. Exhs. 11 and 18. Regarding accreditation, Dr. Tekben testified,

"A The discussions, in answering the second part of your question, is mostly centered around all as follows:

Do we need to have accreditation? My feeling has been no, I don't need it. I don't need to bring four, five, six people from somewhere else, a good number of them I know are my colleagues, and in order to tell me whether or not I'm providing adequate at least adequate care and treatment for my patients, who are my responsibility.

I could spend energy and channel that energy toward more essential things such as sitting down and providing the care, direct care for the patient, instead of piling up the papers, going to all the 1500 standards.

Since there was no incentive for the State to obtain, meanwise, the reimbursements, it did appear fortuitous and not necessary and I felt I was using my staff energy for something.

And if I may add to that, since we start seeing it, being accredited as being, in quote, "prestige," and since frankly speaking, maybe I'm blunt, is a source of irrita[tion] to me, including my being here today because of that, and I'm, at the stage with my staff, we might have—I haven't decided, we may apply for a survey in the summer of 19 [8]6, so we will be one of the others."

Tr. May 17, 1985 at 261–62.

That position seems to be in agreement with Dr. Katz's view concerning JCAH accreditation for Mid-Hudson and contrary to the Commission's goal that all hospitals be JCAH accredited. Dr. Katz testified,

"A ... I would restate my feeling about accreditation. I think it provides a

valuable service. It is not the sole or most significant measure of quality of patient care. And it's very simple, very straightforward. And I have said that for twenty years. Everybody knows, and it's in print in a lot of places ...[9] Mid-Hudson will seek accreditation if they do, if their decision is they seek accreditation, primarily as a reward and moral issue. There is no advantage in Mid-Hudson having accreditation from us. It's a superb institution, and I have been there, spent time there, and seen the services they deliver. That unfortunately was built in a different [era] and structurally it makes it diffucult to comply with JCAH, but the primary goals for us in that would be primar[il]y to reward the institution as a moral issue, to show them we really think they are terrific, and they should be accreditated, if they want to. It has no other value."

Tr. June 5, 1985 at 109–10.[10]

Although Mid-Hudson has been inspected by the State Department of Health and the Orange County Fire Department, no outside entity or individual routinely visits the facility to assure adequate care. Mention was made of a survey in March 1985 by a federal employee under the "Federal Civil Rights Handicapped Act"; however, neither the extent of nor the results of that survey are in evidence.

As an example of inadequate care, plaintiffs inquired about the 1979 death of a patient, Mia Martine (pseudonym). The findings of the Commission's Medical Review Board concerning her case were reported in a 1983 newsletter, inserted in plaintiffs' posthearing brief, and are contained in Pl. Exh. 18. At the hearing, the Court did not understand the relevance of that case to establishing grounds for a preliminary injunction, a point illustrated by the contents of the newsletter, which states in part,

"Commission investigation and Medical Review Board findings in this case included: the extended use of seclusion on four occasions during the last month of this patient's life; absence of documentation by physicians justifying the continued use of seclusion and restraint or providing evidence of attention to the patient's physical condition; transfer of the patient to the infirmary without examination by a physician prior to transfer or while the patient was in the infirmary, although the patient exhibited symptoms of a physical illness and a marked change from her usual behavior pattern; lack of sufficient medical information and medical history transferred with the patient when she arrived at the hospital; and incomplete and insufficient toxicology and autopsy."

Those findings do not enlighten the Court as to what standards are in existence at Mid-Hudson, whether they are employed, and if so, whether this tragic incident represents an isolated case as opposed to a representative sample of the average quality of care delivered to Mid-Hudson patients. Significantly, plaintiffs have not demonstrated that a JCAH accredited Mid-Hudson would be immune from acts of negligence which produce damage that may give rise to a violation of a patient's constitutional rights.

Significantly, too, Dr. Tekben's testimony about the use of seclusion, confining a patient in a space behind a locked door, at Mid-Hudson, suggests that the Medical Review Board's findings were adopted.

---

9. Plaintiffs assert that they searched for but could not find the writings to which Dr. Katz referred. While Dr. Katz has not identified the relevant publications, the Court deems this point collateral to the issue of constitutionally adequate care at Mid-Hudson. Whatever views Dr. Katz may hold about the value of JCAH accreditation, defendants are obligated to provide constitutionally adequate care to Mid-Hudson patients, and plaintiffs, in the first instance, bear the burden of demonstrating that defendants have not honored this obligation.

10. The Court believes that the word "moral" in this excerpt from Dr. Katz's testimony should read "morale". Dr. Katz also stated that New York is one of the few state mental health systems that has ever aspired to JCAH accreditation.

"Q What form of care do you give to a patient in seclusion?

"A They are taken out every two hours to the toilet. They are given a shower. If they need more than that, they are taken out more frequently. They are fed and if they are on medication, the medications are given. They are observed every 15 minutes by the ward personnel. Very frequently by the nurse. At least twice during the day by the psychiatrist and at least once a day by the team, psychiatrists, psychologists, social workers, recreation therapist, they see how the patient is evaluated. How he or she is doing."

Tr. May 17, 1985 at 320.

"Q Doctor, how often does a physician have to write an order for seclusion, formally write an order for seclusion on an order sheet?

"A Every four hours, except when the patient is sleeping."

Tr. May 17, 1985 at 322. This last requirement is part of an Office of Mental Health regulation enacted in the late 1970's.

If the procedures related by Dr. Tekben are followed, a reasonable expectation is that a patient placed in seclusion should not succumb from neglect; however, as Dr. Tekben commented,

"... Since about that case [referring to Martine], with your permission, I'd like to correct that because counsel said that the patient was not seen. The actual record says it was not documented."

Tr. May 17, 1985 at 324.

The probability that staff at Mid-Hudson document what they have done and do not document what they have not done concerning monitoring patients in seclusion has not been raised as an issue. Unlike BPC, moreover, the record does not show that failure to document is a frequent occurrence at Mid-Hudson so as to permit the inference that the standard of care is failure to deliver services illustrative of adequate, if not vital, treatment.

After seclusion, counsel moved to the use of camisoles (strait jackets) and restraint sheets (immobilizing the patient by tieing the sheet at the edge of the bed). Like secluded patients, patients in restraints are monitored (every two hours) and the monitoring is documented. This practice also emanated from the Office of Mental Health. The purpose of this line of inquiry appears to be the belief that restraint is an overutilized form of treatment at Mid-Hudson. Dr. Tekben admitted that Mid-Hudson probably uses restraints more than other hospitals primarily because the transfer patients are "the most dangerous unmanageable patient group." With the exception of a Medical Review investigation, which would be prompted by the death of a patient, no outside body reviews seclusion orders or the use of restraints.

"[I]f a mental patient is involuntarily confined because he is dangerous, due process requires a specific focus to the treatment which is his right. Treatment efforts must be directed to that aspect of he behavior which caused him to be classified as dangerous so that he has a reasonable opportunity to be eventually discharged from maximum security confinement."

*Eckerhart, supra,* 475 F.Supp. at 915.

Although the dangerousness of Mid-Hudson patients separates them from other involuntarily civilly committed patients, especially in view of their potential for violence, that condition should not deprive them of adequate care. *See Rone, supra,* 473 F.Supp. at 118–19 (discussion therein). Dangerousness, however, inevitably affects the nature of the appropriate treatment. *See Eckerhart, supra,* 475 F.Supp. at 914 n. 16. For reasons possibly related to plaintiffs' argument that a non-JCAH accredited facility does not provide constitutionally adequate care, the record is unenlightening as to whether defendants provide appropriate or inappropriate treatment for the involuntarily civilly committed patient at Mid-Hudson. Accordingly, plaintiffs' application for injunctive relief at Mid-Hudson is denied.

The disposition of plaintiffs' applications for injunctive relief leaves two issues stemming from the Court of Appeals opinion:

"For the reasons we have attempted to articulate with some precision, we believe the district judge abused his discretion by decertifying the class.

"On remand, subclasses should be certified as appropriate to press the outstanding claims we have indentified." 729 F.2d at 107. Pursuant to Fed.R.Civ.P. 23(b)(2), the Court originally certified a class "of all persons between the ages of 21 and 65 who are or who will be involuntarily civilly committed to New York State mental institutions." *Woe v. Mathews*, 408 F.Supp. 419, 429 (E.D.N.Y.1976). To enforce the Court of Appeals' direction with plaintiffs' focus upon JCAH accreditation as the yardstick of constitutionally adequate care, the Court recertifies the original class and divides that class into subclasses consisting of all persons between the ages of 21 and 65 who are or who will be involuntarily civilly committed to a named New York State mental Institution. These subclasses are also intended to effectuate the following portion of the Court of Appeals opinion,

"In addition, we note that mental institutions within the New York State system have lost and regained accreditation even within the course of this litigation. We would expect, of course, that the district judge will reexamine the facts as they exist at the time he revises class certification and as they evolve thereafter." 729 F.2d at 108.

The second issue concerns attorneys' fees.

"Appellants' counsel also seeks an award of attorneys' fees for his efforts to date. Although we applaud his efforts on behalf of the unfortunate, forgotten, and all-too-often unrepresented members of the appellant class, we are barred from making an award in these circumstances. *See Hanrahan v. Hampton*, 446 U.S. 754 [100 S.Ct. 1987, 64 L.Ed.2d 670] (1980). In any event, we believe this issue is more appropriately left to the discretion of the conscientious district judge, who bears the primary burden for shepherding this litigation."

*Id.* In response, plaintiffs seek what they characterize as "interim fees" for their pursuit of preliminary injunctions against Kings Park Psychiatric Center in 1980 and Manhattan Psychiatric Center in 1982. In both instances, the hospitals had lost and later regained JCAH accreditation. Defendants counter that plaintiffs are not prevailing parties because the Court never granted either motion for a preliminary injunction. The record, as related by the Court of Appeals, reveals that the Kings Park Motion seemingly evaporated after a conference, 729 F.2d at 100, and the Court treated the Manhattan motion as part of defendants' then pending motion for summary judgment. Thus, in both cases, while the Court did not grant the relief requested, both hospitals eventually obtained plaintiffs' sought after result, JCAH accreditation.

"In *Nadeau [v. Helgemoe*, 581 F.2d 275 (1st Cir.1978) ], the court held that a person who brings an action alleging a civil rights violation, but who does not receive a judgment on the merits, is still a prevailing party for purposes of [42 U.S.C.] § 1988 if he shows (1) that his lawsuit is causally linked to securing the relief obtained and (2) that the defendant's conduct in response to the lawsuit was required by law."

*J & J Anderson, Inc. v. Town of Erie*, 767 F.2d 1469, 1473 (10th Cir.1985); *accord Ortiz de Arroyo v. Barcelo*, 765 F.2d 275, 282 (1st Cir.1985).

Inasmuch as the parties have not referred to the above cited relevant authorities, they have not addressed whether plaintiffs should be deemed to have prevailed because defendants capitulated to their demands for care in a JCAH accredited facility.

Although this lawsuit began in 1975, nothing in the record suggests that defendants' actions or attitudes concerning JCAH accreditation have been affected by the litigation. Hospitals in the state mental health system have lost and regained accreditation in the course of defendants' attempts to deal with a crisis, especially in

the New York metropolitan area. For example, although plaintiffs expressed an intent to challenge the constitutionality of care at BPC and Mid-Hudson in December 1984, defendants did not rush to return BPC to a condition meriting reaccreditation. They had no intention of having BPC resurveyed at least until after the renovations scheduled for completion in March 1986. Similarly, the testimony permits the inference that defendants have no intention of ever submitting Mid-Hudson to a JCAH survey.

 The court also recognizes that defendant'a motivations for their attitudes toward accreditation do not stem from this Court's ruling that JCAH accreditation is not mandatory for constitutional purposes. Under that rule, which governs this case, in both prior motions, plaintiffs had obtained not only what they sought but also what the law did not require, JCAH accredited hospitals. *See California Ass'n of the Physically Handicapped, Inc. v. F.C.C.*, 721 F.2d 667, 672 (9th Cir.1983). Under these circumstances, plaintiffs have not established that they are prevailing parties in either of their prior motions.[11]

 Plaintiffs also seek attorneys' fees for the instant applications. Concerning Mid-Hudson, they have lost on the merits and therefore may not receive fees. With respect to BPC, however, they have prevailed on the issue of the quality of care, and accordingly are entitled to injunctive relief as previously noted and therefore as prevailing parties are also entitled to fees under 42 U.S.C. § 1988. *Cf. Paragould Music Co., Inc. v. City of Paragould, Arkansas*, 738 F.2d 973, 975 (8th Cir.1984) (per curiam) ("The present case differs from those cases cited by appellants where the grant of temporary or preliminary relief supported the award of attorney's fees. In those cases, the plaintiffs' suit was a catalyst to bring about the relief sought, or the district court made a ruling on the merits." (citations omitted)).

Accordingly, plaintiffs have 20 days from the date of this order to submit their fee application and all supporting documentation. Thereafter, defendants will have 20 days to respond, and in turn, plaintiffs will have 10 days to reply to defendants' response.

SO ORDERED.

---

**11.** The Court acknowledges that a different analysis governs in the Fifth Circuit.

"When the plaintiff has shown both that he succeeded on the central issue in the litigation and that the lawsuit caused the defendant to act, he has made a prima facie case that he is the prevailing party and entitled to attorney's fees. There is no reason to require the plaintiff to prove, in addition, that the defendant's conduct fulfilled a legal obligation or otherwise to show the defendant's motivation.

"However, a plaintiff who brings an action that has no colorable, or even reasonable, likelihood of success on the merits is not entitled to recover attorney's fees if the defendant simply complies with the plaintiff's demands and moots the case for reasons that have nothing to do with the potential merit of the suit. Whether activated by economic, political, or purely personal concerns, a defend-

ant may choose voluntarily to make the change sought in the suit rather than undergo protracted and expensive litigation.

"A defendant who contends that his conduct was a wholly gratuitous response to a lawsuit that lacked colorable merit, must demonstrate the worthlessness of the plaintiff's claims and explain why he nonetheless voluntarily gave the plaintiffs the requested relief."

*Hennigan v. Ouachita Parish School Bd.*, 749 F.2d 1148, 1152–53 (5th Cir.1985). The appropriateness of such a distribution of burdens of proof between the parties on the issue of fees is not before the Court. Putting the question of defendants' legal obligations to one side, plaintiffs have offered nothing to demonstrate that their motions for preliminary injunctions were the catalysts to reaccreditation at either Kings Park or Manhattan.