NORTHERN PENNA. LEGAL SERV-ICES, INC., Eugene F. Smith, O. Randolph Bragg, Ira Mark Goldberg, Sylvia H. Hahn, Eugene J. Doud, J. Palmer Lockard, Ben Josielevski, Sally F. O'Brien, and Patricia W. Jezerski, Plaintiffs,

v.

COUNTY OF LACKAWANNA; Charles Luger, Robert Pettinato, and Chester Lasota, individually and in their official capacity as Commissioners of Lackawanna County; Andrew M. Wallace, individually and in his official capacity as Administrative Director of Lackawanna County, Defendants.

Civ. No. 81–0435.

United States District Court,
M. D. Pennsylvania.

April 13, 1981.

O. Randolph Bragg, Ira Mark Goldberg, Northern Pa. Legal Services, Joseph E. Gallagher, Scranton, Pa., for plaintiffs.

James Ligi, Brian Cali, Scranton, Pa., for defendants.

## MEMORANDUM

## I. BACKGROUND

NEALON, Chief Judge.

This case comes before the court on a motion by the plaintiffs for a preliminary injunction. There are ten plaintiffs, *viz.*, Northern Pennsylvania Legal Services, Inc. ("NPLS") and nine of its staff attorneys. The defendants are Lackawanna County; its three Commissioners, Charles Luger, Robert Pettinato, and Chester Lasota; and Andrew M. Wallace, the County's Administrative Director. The complainants seek relief on the basis of several constitutional theories. Subject matter jurisdiction rests on 42 U.S.C. §§ 1983 and 1985 and 28 U.S.C. § 1343. There is also a pendent state claim premised on breach of contract.

NPLS is a nonprofit corporation created to provide legal services to eligible indigents. The organization functions under regulations promulgated by The Legal Services Corporation and The Pennsylvania Legal Services Corporation ("PLSC"), which were respectively founded by Congress and the Commonwealth. In this capacity, NPLS represents poor persons in a wide variety of matters. The instant action, nevertheless, arose out of the institution's work in connection with juveniles.

Pennsylvania law requires all counties to provide indigent minors with counsel in court suits conducted to determine delinquency or dependency. 42 Pa.C.S.A. § 6337. NPLS began handling such cases during the 1960's. In 1977, PLSC informed the plaintiff-corporation that according to applicable regulations a legal services organization normally could not represent litigants who had a statutory right to have counsel furnished by county government. However, an exception to this rule existed. Legal aid lawyers could appear on behalf of such individuals if the relevant county provided funding. The Lackawanna authorities evidently desired that NPLS continue its work in juvenile matters. In 1978, the Commissioners adopted a resolution authorizing a contract in which the plaintiff-corporation agreed to represent all alleged delinquents in the County for one year in exchange for $6,000.00. The parties never signed a written document to this effect. Nevertheless, the arrangement was carried out. Similar enactments were adopted in succeeding years. The resolution presently in effect, which was passed on December 9, 1980, sets NPLS's compensation during 1981 at $9,000.00. A parallel agreement exists in the area of juvenile dependency. In December 1980, the Commissioners enacted a resolution permitting a payment of $12,000.00 for such representation.[1]

Over the years, County compensation for juvenile work has proved quite important to the plaintiff-corporation. Under Title XX of the Social Security Act and other laws applicable to legal aid organizations, NPLS was able to "match" the Lackawanna payments against other state and federal monies in order to receive a yield of 250% over the original sum. In 1981, for example, the plaintiff-corporation could expect to receive $52,500 as a result of this match.[2] The increased yield provided more than enough compensation for the NPLS to handle delinquency and dependency litigation in the County. The excess reserve was placed in the institution's operating budget and, thus, went to finance the representation of indigents in other matters. In previous years, the plaintiff-corporation has expanded both

1. Arrangements of this type were also established with regard to the representation for elderly residents of Lackawanna and terms under which NPLS could use County photostating facilities. At the hearing on the instant motion, however, the parties agreed that these matters are not presently at issue.

2. There is some confusion in the record concerning the proper figure. The dependency ($12,000.00) and delinquency ($9,000.00) arrangements total $21,000.00. Two hundred fifty percent of that figure is $52,500.00. The plaintiffs have submitted some documents suggesting that the proper sum is $65,000.00. Yet that calculation includes $5,000.00 pertaining to the photostat matter, which is not presently at issue.

its staff and the scope of its activities in reliance upon the funds anticipated from the match.

On March 19, 1981, defendant Wallace mailed a letter to plaintiff Smith, director of the NPLS, which stated:

Dear Attorney Smith:

Since it has become very apparent that the County of Lackawanna and the Northern Pennsylvania Legal Services, Inc. must maintain an adversary position, we feel it appropriate to terminate our present relationship with your agency.

Please accept this Letter as an intention on the part of Lackawanna County to cancel all outstanding agreements with Northern Pennsylvania Legal Services, Inc. effective March 31, 1981.

This action could have disastrous consequences for NPLS. Mr. Smith testified that the loss of revenue caused by the termination would immediately require the dismissal of two lawyers and one secretary from the staff. Plaintiff Goldberg, the Managing Attorney at the Scranton office, agreed that this loss of personnel would throw the corporation's caseload into "utter chaos" and possibly preclude representation of any new indigent clients. NPLS brought the present suit to prevent these events from taking place. The motivation behind the termination, of course, is central to resolution of the case.

NPLS has recently been involved in litigation concerning the defendants. NPLS has filed a suit on behalf of certain prisoners challenging alleged constitutional violations at the Lackawanna County Prison. *Williams v. Lackawanna County Prison*, Civil No. 81–0106 (M.D.Pa., filed January 21, 1981). In February of this year, moreover, a NPLS attorney won a case in the Pennsylvania Supreme Court reversing a decision by the Court of Common Pleas to terminate the parental rights of certain indigents. The opinion severely criticized the Lackawanna County Bureau of Children's Services. *In re Adoption of M. M.*, 492 Pa. 457, 424 A.2d 1280 (Pa.Sup.Ct.1981). Throughout this litigation, the plaintiffs have maintained that the defendants repudiated the delinquency and dependency arrangements in retaliation for NPLS's participation in such litigation.

During the hearing on the instant action, Mr. Smith testified that Commissioner Luger informed him on several occasions that the termination was in response to the *Williams* and *M. M.* suits. This assertion is unrebutted. At least for the purpose of the instant motion, the court shall accept the plaintiffs' version of the cessation as correct. *See* Fed.R.Civ.P. 65(a)(2). The record justifies no other conclusion.[3]

■ In assessing a request for a preliminary injunction, a trial court must weigh four factors: (1) the likelihood that the complainants will prevail on the merits, (2) the possibility that the plaintiffs will suffer irreparable harm in the absence of an injunction, (3) the chances that favorable action on the motion will harm other interested parties, and (4) the public interest. *Commonwealth of Pennsylvania ex rel. Creamer v. United States Department of Agriculture*, 469 F.2d 1387, 1388 n.1, (3d Cir. 1972). *See also* Wright & Miller, *Federal Practice and Procedure*: Civil § 2948 (1973). Each of these items shall be assessed individually. Analysis indicates that the motion should be granted.

## II. REASONABLE LIKELIHOOD OF SUCCESS

■ The complainants need not prove that all of their claims are potentially meritorious in order to satisfy the first requirement for a preliminary injunction. On the contrary, they may carry their burden by simply demonstrating there is a reasonable likelihood that they will ultimately win the relief they seek. *Tenants for Justice v. Hills*, 413 F.Supp. 389, 391 (E.D.Pa.1975). A review of the evidence indicates that

---

**3.** Mr. Wallace suggested in his testimony that the defendants had other reasons for being dissatisfied with NPLS. Yet when asked for specifics, he gave none. Mr. Bolock, the only other witness proffered by the defendants, did not address the reasons for the termination. Accordingly, Mr. Smith's accusations are uncontested.

three of the arguments offered by the plaintiffs establish such a likelihood. Two of these contentions are constitutional: freedom of expression and substantive due process. The third proposition is the pendent state claim.[4]

### A. Substantive Due Process

■ Analysis of this argument requires two separate inquiries. First, the court must decide if the complainants' interest in continuation of the juvenile representation arrangements constituted "property" as the term is used in the Due Process Clause of the Fourteenth Amendment. If so, it will then be necessary to determine if the defendants impaired that property interest in an arbitrary or capricious manner. NPLS and its lawyers will not succeed unless both of these questions have affirmative answers.[5] *Brenna v. Southern Colorado State College*, 589 F.2d 475, 476–78 (10th Cir. 1978).

#### 1. Property Interest

■ A lawyer has no automatic right to appear on behalf of a particular client. In most instances, any "property" interest in such representation must be spawned in state law. *Leis v. Flynt*, 439 U.S. 438, 443, 99 S.Ct. 698, 701, 58 L.Ed.2d 717 (1979). NPLS contends that the arrangements it has with the Commissioners for juvenile representation constitute valid contracts under Pennsylvania jurisprudence and, for that reason, are "property" which may not be divested without due process.

*Bishop v. Wood*, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976), provides the proper framework for analysis of this proposition. The case concerned a former municipal policeman from North Carolina who challenged his dismissal on constitutional grounds. The officer first argued that a city ordinance classified him as a "permanent" worker and, as such, entitled him to expect continued employment in the absence of negligence, inefficiency or unfitness. The policeman then reasoned that the law created a "property interest" which trigged the Due Process Clause and entitled him to tenure which could not be revoked in the absence of misconduct on his part. Speaking for a majority of the United States Supreme Court, Justice Stevens explained the following:

> A property interest in employment can, of course, be created by ordinance, or by an *implied contract.* In either case, however, the sufficiency of the claim of entitlement must be decided by reference to state law.

*Id.* at 344, 96 S.Ct. at 907. (footnotes omitted, emphasis added). The Court then examined the relevant North Carolina authorities. Justice Stevens concluded that according to state law, the officer's tenure was "at the will and pleasure of the city" and, consequently, no legitimate expectation of continued employment existed. On this basis, the *Bishop* majority ruled that the policeman had "no property interest" at stake which spawned constitutional safeguards. *Id.* at 345–47, 96 S.Ct. at 907–908.

There is overwhelming support for this approach. Many cases have held that valid contractual rights against a government body, both explicit and implicit, create property interests within the scope of the Due Process Clause. *See, e. g., Perry v. Sindermann*, 408 U.S. 593, 599–603, 92 S.Ct. 2694, 2690–2700, 33 L.Ed.2d 570 (1972); *Board of Regents v. Roth*, 408 U.S. 564, 576–78, 92 S.Ct. 2701, 2708–09, 33 L.Ed.2d 548 (1972); *Larionoff v. United States*, 533 F.2d 1167, 1179 (D.C.Cir.1976), *aff'd*, 431 U.S. 864, 879, 97 S.Ct. 2150, 2159, 53 L.Ed.2d 28 (1977); *Peretti v. State of Montana*, 464 F.Supp.

---

4. This Memorandum offers no opinion concerning the soundness of the other theories proffered by the NPLS and its staff attorneys.

5. The plaintiffs have offered a separate procedural due process theory in which they state that while the termination may not have been unconstitutional *per se*, it was invalid in the instant case because NPLS did not receive a hearing before the decision to end the arrangements. Analytically, this proposition is quite different from the present question. *See, e. g., Ingraham v. Wright*, 430 U.S. 651, 674–82, 97 S.Ct. 1401, 1414–18, 51 L.Ed.2d 711 (1977); *Matthews v. Eldridge*, 424 U.S. 319, 340, 96 S.Ct. 893, 905, 47 L.Ed.2d 18 (1976).

784, 782–88 (D.Mont.1979). As in *Bishop*, however, no property interest exists in the event that the private party had no legal right to expect that the arrangement would in fact be binding. *Schlake v. Beatrice Production Credit Association*, 596 F.2d 278, 281–83 (8th Cir. 1979). In light of these precedents, this court must examine the juvenile representation arrangements between NPLS and the County in order to determine if there is a likelihood that the plaintiffs will ultimately demonstrate the existence of a contract enforceable according to Pennsylvania law.[6]

■ As previously noted, the delinquency and dependency "agreements" between the defendants and the plaintiff-corporation were not reduced to writing. Yet this fact is by no means dispositive. As the Pennsylvania Superior Court stated in *Egyptian Sands Real Estate v. Polony*, 222 Pa.Super. 315, 320, 294 A.2d 799 (1972), "Under general contract rules, a promise need not be in writing ...." (footnote omitted) NPLS and its staff have provided ample evidence that the Commissioners offered them an opportunity to represent the indigent juveniles of Lackawanna in delinquency and dependency proceedings, that this offer was accepted, and that consideration was furnished in the form of actual representation. This proof was unrebutted. Counsel for the County, moreover, explicitly disavowed any argument that the alleged "contract" was invalid for want of a writing.[7] In view of these circumstances, it is very likely that the complainants will eventually prove the existence of a "property interest."

2. Arbitrary and Capricious Deprivation

■ Due process analysis requires a close examination of state law to determine if the relevant constitutional protections apply. The Fourteenth Amendment, how-

ever, does not codify all common law contract principles. The complainants cannot obtain a federal forum merely because the County may have breached an agreement to which they are a party. To proceed on a substantive due process theory, NPLS and its attorneys must show that the deprivation was "arbitrary, capricious, or without a rational basis." *Brenna v. Southern Colorado State College*, 589 F.2d 475, 477 (10th Cir. 1978). *See also T.A. Moynahan Properties, Inc. v. Lancaster Village Corporation, Inc.*, 496 F.2d 1114, 1117 (7th Cir. 1974).

[8, 9] This court has little doubt that any further inquiry into this matter on substantive due process rationale would be foreclosed if: (1) Pennsylvania law permitted the Commissioners to end the delinquency and dependency arrangements, and (2) the actual termination of the agreements was arguably within the legal terms of such a cessation. This result would be the same even if the complainants could pursue a breach of contract action in state court successfully. *Brenna v. Southern Colorado State College*, 589 F.2d at 477. At the evidentiary hearing, however, the defendants failed to rebut the plaintiffs' evidence which demonstrated that the termination had only one motive: retaliation for NPLS's representation of the *Williams* and *M. M.* litigants. This development precludes a ruling favorable to the defendants on the instant matter at the present time.

The Constitution does not permit a governmental body to punish attorneys simply because they decide to represent particular clients. The authorities may not deter individuals from seeking relief in court through threats or other punitive actions. *Silver v. Cormier*, 529 F.2d 161, 163 (10th Cir. 1976). Furthermore, official action designed to thwart litigation constitutes a clear viola-

---

6. At the evidentiary hearing, counsel for the defendants made much of the fact that NPLS is an independent contractor rather than an employee. No authority was offered to support the conclusion that this distinction is relevant. *Bishop, Perry,* and *Roth* concerned employees, but nothing in the rationale of these authorities suggests that the analysis for independent contractors would be different. *Peretti* and

*Schlake,* conversely, concerned nonemployees, and their results were not affected by that characterization.

7. Under Pennsylvania law, certain contracts must ordinarily be in writing. *See, e. g.,* 13 Pa.C.S.A. § 2201 (contracts for the sale of goods in excess of $500).

tion of the First Amendment.[8] In addition, the record does not suggest any valid policy that could have motivated the termination of the agreements in question. Consequently, it must be concluded that the plaintiffs have a reasonable likelihood of success on the substantive due process claim. *United States Railroad Retirement Board v. Fritz*, —— U.S. ——, 101 S.Ct. 453, 458–61, 66 L.Ed.2d 368 (1980).

### B. The First Amendment

Freedom of expression is among the basic liberties shielded by the First Amendment. The latter enactment, of course, is applicable to the States under the Fourteenth Amendment. The plaintiffs argue that the interruption of the various contracts with the County was intended to infringe the right of NPLS lawyers to engage in certain court suits. The complainants further contend that litigation is a form of expression protected by the Constitution. On this basis, it is maintained that the termination must be enjoined as a transgression of the First Amendment.

 A critical observation should be noted at the very beginning of this analysis. The existence or nonexistence of a "property interest," which is crucial in due process matters, has no relevance to the First Amendment framework. In *Mt. Healthy School District v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), an untenured teacher sought relief from a decision by school board officials to refrain from renewing his contract. The plaintiff maintained that the action was in retaliation for certain statements he had made to a radio station. On behalf of a unanimous Supreme Court, Justice Rehnquist wrote that:

> [The teacher's] claims under the First and Fourteenth Amendments are not defeated by the fact that he did not have tenure. Even though he could have been discharged for no reason whatever, and had no constitutional right to a hearing prior to the decision not to rehire him, he may nonetheless establish a claim to rein-

statement if the decision not to rehire him was made by reason of his exercise of constitutionally protected First Amendment freedoms.

*Id.* at 283, 97 S.Ct. at 574 (citation omitted). *See also Perry v. Sindermann*, 408 U.S. at 596–98, 92 S.Ct. at 2697–98. Justice Rehnquist then went on to explain that proper First Amendment analysis must occur in two stages. First, the trier of fact has to determine if exercise of a constitutional right was a "substantial" or "motivating" factor behind the official action. If so, then the burden of proof shifts to the defendants to demonstrate by a preponderance of the evidence that the same result[9] would have occurred without the improper motive. *Id.* at 287, 97 S.Ct. at 576. Failure of the Commissioners to carry that burden would require a ruling for the plaintiffs.

 There is no doubt that the first part of the *Mt. Healthy* test is satisfied in this litigation. As citizens, the staff attorneys certainly enjoy the right to freedom of expression. The same is true of the NPLS even though it is a corporation. *Consolidated Edison Company of New York v. Public Service Commission of New York*, 447 U.S. 530, 534–37, 100 S.Ct. 2326, 2331–33, 65 L.Ed.2d 319 (1980). Furthermore, "[l]itigation itself is a form of expression protected by the First Amendment." *In re Halkin*, 598 F.2d 176, 187 (D.C.Cir. 1979). *See also In re Primus*, 436 U.S. 414, 431, 98 S.Ct. 1893, 1904, 50 L.Ed.2d 417 (1978); *United Transportation Union v. State Bar of Michigan*, 401 U.S. 576, 585–86, 91 S.Ct. 1076, 1082, 28 L.Ed.2d 339 (1971); *NAACP v. Button*, 371 U.S. 415, 428–45, 83 S.Ct. 328, 335–344, 9 L.Ed.2d 405 (1963). Finally, for reasons explained in Part I of this Memorandum, the unrebutted evidence reveals that the defendants desired to retaliate against NPLS for its participation in certain lawsuits.

 The testimony and documentation presented at the hearing also established that the defendants are likely to prevail on

---

**8.** *See* Part IIB of this Memorandum.

**9.** In the instant case, the "result" would be repudiation of the County-NPLS contracts.

the second prong of the *Mt. Healthy* test. Not a shred of evidence has been presented which suggests a policy behind the cut-off other than reaction to *Williams* and *M. M.* Accordingly, the present record indicates that the defendants could not demonstrate that the dependency and delinquency contracts would have been repudiated if *Williams* and *M. M.* had never been filed.

### C. The Pendent Claim

■ The court has already discussed many of the considerations relevant to this issue. Pennsylvania jurisprudence permits the judiciary to enjoin prospective breaches of contract provided that the traditional requirements for equitable relief are satisfied. *Blenko v. Schmeltz*, 362 Pa. 365, 371–77, 67 A.2d 99 (1949). As previously established, the plaintiffs have shown that there is a strong possibility that their agreements with the County were binding contracts and that the reasons for termination were not even vaguely justified under state law. Furthermore, nothing suggests that the plaintiffs suffer from "unclean hands" or any of the other traditional bars to equitable relief. Thus, there is a sufficient "likelihood" of success on the pendent claim to satisfy the first requirement for a preliminary injunction.

### III. REMAINING REQUIREMENTS

■ The facts of this case also establish that NPLS and its staff possess the other prerequisites to the remedy they seek. The plaintiffs are threatened with transgressions of their rights under the Due Process Clause and the First Amendment. Violations of a litigant's constitutional rights constitute "irreparable harm" *per se.* No other injury is required for an injunction provided that the other necessary ingredients to relief are present. *Elrod v. Burns*, 427 U.S. 347, 373–4, 96 S.Ct. 2673, 2689–90, 49 L.Ed.2d 547 (1976). The evidence presented at the hearing further demonstrated that termination of the agreements on juvenile representation would probably disrupt the operations of NPLS so severely that monetary damages might not render the plaintiffs whole if they ultimately prevail.

Also, the defendants did not present any evidence at the hearing which even closely suggested that a preliminary injunction in favor of the complainants would harm any third parties. Indeed, the outside individuals most interested in the outcome would be the various indigents currently represented, or eligible for representation, by NPLS. No testimony or documentation in the record implies that these parties would be harmed by continuation of the *status quo.* On the contrary, termination of the arrangements might even injure many of these parties since only juvenile dependents and accused delinquents would be insured of continued representation.

■ Finally, there is the matter of the public interest. Again, the court must emphasize that the evidence presented at the hearing requires that, for the purposes of this action, it be concluded that the repudiation was in retaliation for the initiation of certain lawsuits. There certainly is no public interest in such deterrence. Indeed, the latter consideration favors entry of an injunction. This action will have two salutary effects: (1) prevention of several potential violations of the United States Constitution and (2) guarantee that the flow of legal assistance to the poor will not be interrupted for improper reasons.

### IV. OTHER DIRECTIONS

The preliminary injunction entered today shall take effect immediately. The parties are directed to inform the court within seven (7) days of the discovery they intend to conduct prior to a final hearing on the matter. They should also suggest a time frame in which such a hearing could be held. Representatives for both sides are encouraged to meet and stipulate to as many issues as possible.

■ Federal Rule of Civil Procedure 65(c) states that no "preliminary injunction shall issue except upon giving of security by the applicant, in such sum as the court deems proper." The defendants have

presented no evidence suggesting that maintenance of the *status quo* will cause them added expenses. They have a statutory obligation to provide representation in all delinquency and dependency cases in any event. There is no evidence that continuance of the present arrangements will prove more expensive than their planned alternative. Some courts have held that in these circumstances the security requirement may be waived entirely. *International Controls Corporation v. Vesco*, 490 F.2d 1334, 1356 (2d Cir. 1974) *cert. denied*, 417 U.S. 932, 94 S.Ct. 2644, 41 L.Ed.2d 236 (1974). Our Court of Appeals has reserved opinion on this rule. *System Operations v. Scientific Games Development Corporation*, 555 F.2d 1131, 1145 (3d Cir. 1977). In light of the uncertainty in this circuit, the court will require the plaintiffs to post a nominal security of $100.00. Wright & Miller, *Civil Practice & Procedure*: Civil § 2954.

## V. CONCLUSION

The federal judiciary is naturally reluctant to interfere in the affairs of local government. The present case, however, presents a special situation. Review of the record conclusively demonstrates that a preliminary injunction is proper. As previously explained, the defendants have not contradicted substantial evidence to the effect that the termination would be unconstitutional. The theories proffered by the plaintiffs, moreover, are neither attenuated nor exotic. Rather, they have considerable support in the authorities rendered by the United States Supreme Court and other respected tribunals. In short, the instant suit is one of those rare instances in which a federal district court must, and shall, enjoin an action of local officials.