**INDEPENDENCE PUBLIC MEDIA
OF PHILADELPHIA, INC.**

v.

**PENNSYLVANIA PUBLIC
TELEVISION NETWORK
COMMISSION, et al.**

**No. 92–0109.**

United States District Court,
E.D. Pennsylvania.

Feb. 10, 1993.

Eric B. Schnurer, Philadelphia, PA, for plaintiff.

Calvin R. Koons, Office of Atty. Gen., Harrisburg, PA, for defendants Pennsylvania Public Television Network Com'n, H. Sheldon Parker, Jr., Bart H. Cavanagh, Sr., Joseph D. Hughes, Richard A. Stafford, Helen B. Craig, Sheldon P. Siegel.

Christopher K. Walters, Thomas J. Marshall, Reed, Smith, Shaw & McClay, Philadelphia, PA, Robert A. Woods, Schwartz, Woods & Miller, Washington, DC, for defendants, * 419 Public Broadcasting of Northwest Pennsylvania, QED Communications, Inc., Lehigh Valley Telecommunications Corp., Northeastern Pennsylvania ETV Ass'n, Inc., WITF, Inc., Pennsylvania State University, WHYY, Inc.

## MEMORANDUM

PADOVA, District Judge.

Defendants move to reconsider and vacate portions of my Opinion and Order of November 16, 1992 (the "Opinion"), 808 F.Supp. 416. For the following reasons, I will deny their motion.[1]

"The purpose of a motion for reconsideration is to correct manifest errors of law or fact or to present newly discovered evidence." *Harsco Corp. v. Zlotnicki*, 779 F.2d 906, 909 (3d Cir.1985), *cert. denied*, 476 U.S. 1171, 106 S.Ct. 2895, 90 L.Ed.2d 982 (1986). Defendants offer no newly discovered evidence, but contend that the Opinion contains the following three errors of law: (1) I should have abstained pursuant to *Railroad Comm'n v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), from adjudicating plaintiff's "delegation" claims under the Pennsylvania Con-

stitution; (2) I should have abstained under *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), from adjudicating plaintiff's claims of institutional bias under the Federal Constitution; and (3) my injunction of the TV Defendants was in violation of *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). I will address each of these assignments of error in turn.

## I. PULLMAN ABSTENTION

■ Defendants argue that I should have abstained under *Pullman*, 312 U.S. 496, 61 S.Ct. 643, from ruling upon plaintiff's claim that the Pennsylvania Constitution prohibits the Pennsylvania legislature from delegating to the TV Defendants the authority to appoint members of the PPTNC. In the Opinion, I held that *Pullman* abstention is not appropriate with regard to plaintiff's delegation claims because there exist no unsettled questions of state law underlying these claims. *See* Opinion, 808 F.Supp. at 421–22. Defendants now argue that whether the PPTNC exercises legislative power at all is an unsettled matter of law, and, therefore, this Court should have abstained from ruling on whether the Pennsylvania legislature's delegation of appointment power to the TV Defendants is unconstitutional.

Plaintiff's state delegation claims and my ruling on those claims rest upon the holdings of the Supreme Court of Pennsylvania in *Hetherington v. McHale*, 458 Pa. 479, 329 A.2d 250 (1974), and *Commonwealth ex rel. Kane v. McKechnie*, 467 Pa. 430, 358 A.2d 419 (1976). In those cases, the court held that "the power to *appoint* persons to conduct *governmental functions* cannot be delegated to private organizations." *McHale*, 329 A.2d at 251 (emphasis added). I found that Act 329 violates this principle in that it delegates to the TV Defendants, who are private parties, the power to *appoint* persons (PPTNC commissioners) to conduct *governmental func-*

---

1. For purposes of economy and efficiency, I will not set forth here the facts or history of this case. The reader is directed to the Opinion in this matter for such information. Likewise, I will not restate here my holdings in the Opinion, except where necessary. The abbreviations in this Memorandum correspond with the abbreviations used in the Opinion.

*tions (e.g.,* distribution of state funds). *See* Opinion, 808 F.Supp. at 423–24.

Defendants seize upon the term "governmental functions" to urge that this Court should abstain until the state courts have had an opportunity to resolve the ambiguity they feel is inherent in the term.[2] I disagree with defendants. The Commonwealth's highest court has already interpreted the term twice and stripped it of ambiguity for purposes of this discussion.

In *McHale,* the state agency under consideration had been charged by the Pennsylvania legislature with the *sole* function of disbursing public funds. *McHale,* 329 A.2d at 251–52. The Supreme Court of Pennsylvania held, *inter alia,* that the agency was exercising "governmental functions" for purposes of determining whether there had been a violation of the Pennsylvania Constitution's anti-delegation doctrine. *Id.* Two years later, the same court stated that "[w]hether one dollar or one million dollars of public funds is involved, the controlling principle of [*McHale* ] is unaffected.... The decision in [*McHale* ] was not limited to the *governmental function* of *expending funds,* but encompassed all governmental functions." *McKechnie,* 358 A.2d at 420 (emphasis added). Clearly, the court's decisions in these cases did not turn, as defendants contend, upon whether the Pennsylvania legislature delegated "legislative power or authority" to the agencies involved, but whether the agencies exercised ."governmental functions." The court held that under the Pennsylvania Constitution, private parties cannot be given the authority to appoint individuals to distribute public funds or exercise any other governmental functions.

In the Opinion, I found that one of the PPTNC's main responsibilities is to distribute public funds to Pennsylvania public television stations. *See* Opinion, 808

F.Supp. at 423 n. 11. Based upon this finding, I concluded that the PPTNC was necessarily exercising "governmental functions," as that term was defined in *McHale* and *McKechnie. See Id.,* 808 F.Supp. at 423–424. I neither saw then, nor do I see now, any ambiguity whatsoever in the term. Accordingly, I concluded then, as I do now, that there are no unsettled issues of state law underlying plaintiff's state delegation claims that warrant abstention under *Pullman.*

## II. YOUNGER ABSTENTION

■ In the alternative to their arguments for *Pullman* abstention, defendants contend that I should have abstained from deciding plaintiff's federal bias claims under *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and its progeny.[3] "The *Younger* abstention doctrine is a prudential limitation on the federal courts' exercise of jurisdiction when a plaintiff requests that a federal court interfere with ongoing state proceedings." *Ivy Club v. Edwards,* 943 F.2d 270, 278 (3d Cir.1991), *cert. denied,* — U.S. ——, 112 S.Ct. 1282, 117 L.Ed.2d 507 (1992). Defendants argue that my finding in the Opinion that federal notions of due process require PPTNC impartiality in considering plaintiff's requests for network interconnection and funding necessarily means that I must also find that there are ongoing state "proceedings" within the PPTNC; and that *Younger* protects these proceedings from interference by this Court.

■ As an initial matter, I agree with defendants that the PPTNC's consideration of plaintiff's request for network interconnection and funding is a state "proceeding" to which *Younger* may apply. *Younger* applies only to state proceedings "judicial in nature." *New Orleans Pub. Serv., Inc. v. Council of New Orleans,* 491 U.S. 350,

---

2. Defendants contend that this term should be interpreted restrictively to mean "legislative power" or "legislative authority." According to defendants, the PPTNC does not exercise such "legislative power or authority"; therefore, the Pennsylvania legislature's delegation to the TV Defendants of authority to appoint members to the PPTNC cannot be unconstitutional.

3. Although defendants failed earlier to argue *Younger* abstention, they may nonetheless do so now. *See Bellotti v. Baird,* 428 U.S. 132, 143 n. 10, 96 S.Ct. 2857, 2864 n. 10, 49 L.Ed.2d 844 (1976).

370, 109 S.Ct. 2506, 2519, 105 L.Ed.2d 298 (1989) ("*NOPSI*"). "The proper characterization of an agency's actions 'depends not upon the character of the body but upon the character of the proceedings.'" *Id.* (quoting *Prentis v. Atlantic Coast Line Co.*, 211 U.S. 210, 226–27, 29 S.Ct. 67, 69–70, 53 L.Ed. 150 (1908)). Although the "line dividing them may not always be a bright one ... [there is] a recognized distinction in administrative law between proceedings for the purpose of promulgating policy-type rules or standards, on the one hand, and proceedings designed to adjudicate disputed facts in particular cases on the other." *United States v. Florida E. Coast R.R.*, 410 U.S. 224, 245, 93 S.Ct. 810, 821, 35 L.Ed.2d 223 (1973) (explaining distinction recognized in *Londoner v. City & County of Denver*, 210 U.S. 373, 28 S.Ct. 708, 52 L.Ed. 1103 (1908), and *Bi–Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 36 S.Ct. 141, 60 L.Ed. 372 (1915), between rulemaking and adjudication for purpose of determining when the mandates of procedural due process apply to agency activity). In other words,

> 'A judicial inquiry investigates, declares and enforces liabilities as they stand on present or past facts and under laws supposed already to exist. That is its purpose and end. Legislation on the other hand looks to the future and changes existing conditions by making a new rule to be applied thereafter to all or some part of those subject to its power.'

*NOPSI*, 491 U.S. at 370–71, 109 S.Ct. at 2519 (quoting *Prentis*, 211 U.S. at 226, 29 S.Ct. at 69). Thus, agency activity based upon present or past facts, rules and laws that singles out a particular entity for consideration on its own special circumstances is *judicial* in nature, and different from agency activity that seeks to create future rules or standards of general application, which is *legislative* in nature.

■ In the Opinion, I found that in considering plaintiff's request for network interconnection and funding, the PPTNC was and is acting in a judicial capacity, subject, therefore, to the due process requirement of impartiality. Opinion, 808 F.Supp. at 425. The PPTNC actions challenged by plaintiff in this lawsuit are those of rejecting plaintiff's *specific* request for network interconnection and funding. In considering that request, the PPTNC was and, presumably, is considering, among other things, WYBE's location, financial viability, programming, structure and management, and the veracity of WYBE's officials. *See, e.g.,* Affidavit of Sheldon P. Siegel. The PPTNC also considered plaintiff's request in light of the duties and rights created by existing Act 329. *See, e.g.,* Minutes of Regular Quarterly Meeting of the PPTNC of June 28, 1990 (attached as Exhibit 55 to Plaintiff's Brief in Opposition to Defendants' Motions for Summary Judgment). Hence, in considering plaintiff's request, the PPTNC has been conducting an inquiry specific to plaintiff, based upon past and present facts and laws. Moreover, there has been no argument or evidence presented by either party that the PPTNC's activities in this regard were in any way intended to create rules of general applicability and future effect. Accordingly, I concluded earlier, and I reemphasize here, that the PPTNC proceedings at issue in this case are judicial in nature. Thus, these proceedings may be subject to *Younger*.

■ That is not the end of the *Younger* inquiry, however. The Supreme Court has extended *Younger*, which prohibited district court injunctions of ongoing state *criminal* proceedings, to the following: (1) civil proceedings initiated by the state, against the district court plaintiff, in which important state interests were involved and which afforded an adequate opportunity to raise federal claims, *see, e.g., Moore v. Sims*, 442 U.S. 415, 99 S.Ct. 2371, 60 L.Ed.2d 994 (1979); (2) administrative proceedings initiated by a state, against the district court plaintiff, in which important state interests were vindicated and which afforded an adequate opportunity to raise federal claims, *see, e.g., Middlesex County Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982); (3) administrative proceedings initiated by a state at the request of a private plaintiff, against the district court plaintiff, in which important state interests were vin-

dicated and which afforded an adequate opportunity to raise federal claims, see *Ohio Civil Rights Comm'n v. Dayton Christian Schools, Inc.*, 477 U.S. 619, 106 S.Ct. 2718, 91 L.Ed.2d 512 (1986); and (4) civil proceedings initiated by a private plaintiff, against the district court plaintiff, in which important state interests were implicated and which afforded an adequate opportunity to raise federal claims, see *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987). Three common threads run through these decisions. First, important state interests were implicated in the underlying state proceedings. Second, the state proceedings afforded an adequate opportunity to raise federal claims. Third, the federal court plaintiff was seeking relief from a state proceeding initiated by someone other than the federal court plaintiff, i.e. a *coercive* state proceeding.

■ In the instant case, there is no dispute that important state interests are implicated by the PPTNC proceedings (*e.g.*, the amount and type of support provided by the commonwealth to public television stations), or that plaintiff has been accorded an adequate opportunity to raise federal claims, see *Dayton*, 477 U.S. at 629, 106 S.Ct. at 2724 (It is sufficient that federal claims may be raised in state court judicial review of administrative proceedings.).[4] Thus the sole issues remaining are whether *Younger* applies only to federal court plaintiffs seeking relief from coercive, as opposed to invited, state proceedings, and whether plaintiff here is such a plaintiff.

Although neither the parties nor I have uncovered a case directly addressing whether *Younger* applies only to federal court plaintiffs seeking relief from coercive state proceedings, I believe that such a requirement does exist, at least with respect to suits brought pursuant to 42 U.S.C. § 1983. The source for my belief comes from the Supreme Court's decisions in *Dayton* and *Patsy v. Board of Regents*, 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172

(1982), and the fact that every Supreme Court decision granting *Younger* protection of which I am aware involved federal plaintiffs seeking relief from coercive state proceedings.

*Dayton* and *Patsy* must be examined closely to uncover this limitation on the *Younger* principle. In *Dayton*, a private litigant filed a sex discrimination complaint with the Ohio Civil Rights Commission ("OCRC") against Dayton Christian Schools, Inc. ("Dayton"). 477 U.S. at 623–25, 106 S.Ct. at 2720–22. OCRC found probable cause in the litigant's complaint and subsequently initiated administrative proceedings against Dayton. *Id.* While these proceedings were pending, Dayton filed a suit pursuant to 42 U.S.C. § 1983 in the U.S. District Court for the Southern District of Ohio, seeking a permanent injunction of the OCRC proceedings on the ground that the proceedings involved violations of Dayton's rights under the Religion Clauses of the First Amendment. *Id.* OCRC filed a motion to dismiss based upon federal abstention doctrines. *Id.* The district court did not address OCRC's abstention argument but nonetheless refused to enter the injunction. *Id.* The Court of Appeals for the Sixth Circuit reversed, holding that the exercise of jurisdiction by the OCRC would violate Dayton's rights. *Id.* The Supreme Court subsequently reversed the Sixth Circuit, holding that the District Court should have abstained and dismissed under *Younger* because there was an ongoing state proceeding that implicated important state interests and afforded Dayton an opportunity to raise its federal claims.

In *Patsy*, the plaintiff filed a race and sex discrimination suit pursuant to 42 U.S.C. § 1983 against her employer, Florida Board of Regents ("FBR"), in the U.S. District Court for the District of Florida. *Id.* 457 U.S. at 498–99, 102 S.Ct. at 2558–59. The district court granted FBR's motion to dismiss because the plaintiff had failed to exhaust her administrative remedies. *Id.*

---

**4.** As stated in the Opinion, absent a countervailing showing, "I must assume that the courts of Pennsylvania are capable of and will consider the PPTNC's actions in light of federal as well as state constitutional principles." Opinion, 808 F.Supp. at 431.

A panel of the Court of Appeals for the Fifth Circuit reversed and remanded. *Id.* The full Court of Appeals then vacated the panel decision, holding that under certain circumstances a plaintiff could be required to exhaust her administrative remedies. *Id.* 457 U.S. at 499–500, 102 S.Ct. at 2559–2560. The Supreme Court reversed, holding that litigants need not exhaust their administrative remedies prior to bringing a section 1983 action. *Id.* 457 U.S. at 516, 102 S.Ct. at 2568.

There is tension between *Dayton* and *Patsy.* In *Dayton,* the Court held that a section 1983 action must be dismissed in favor of ongoing, prior state administrative proceedings. In *Patsy,* on the other hand, the Court held that state administrative remedies need not be exhausted prior to initiating a section 1983 action. This tension is present here.

By requesting network interconnection and funding of the PPTNC, plaintiff initiated the state administrative proceedings at issue. Frustrated by the perceived bias of the PPTNC and dissatisfied with that agency's initial decisions, plaintiff then initiated this action during the pendency of the agency's proceedings[5] to vindicate its federal rights under section 1983 and its pendent rights under state law. Application of *Dayton* counsels abstention and dismissal of this case because there is an ongoing, prior state administrative proceeding. *Patsy,* conversely, counsels that I exercise my jurisdiction because plaintiff is not required to exhaust its administrative remedies before proceeding with a section 1983 action. I will resolve the conflict in favor of exercising my jurisdiction.

Dismissing the instant suit under *Dayton* would create a tremendous anomaly: Plaintiff would be denied its right, recognized in *Patsy,* to pursue a section 1983 action in this Court simply because it has taken advantage of, but not *fully* exhausted, its administrative remedies. Put differently, had plaintiff come to this Court first, rather than to the PPTNC, there is no

question that it would be permitted under *Patsy* to proceed undisturbed (provided there were no other jurisdictional infirmities such as lack of ripeness); *Younger* would not be implicated. But since plaintiff afforded the PPTNC the opportunity to act, plaintiff has forfeited its right to sue in federal court under section 1983 until the PPTNC proceedings are concluded. This result runs directly against the teaching and holding of *Patsy* and the Supreme Court's resolution of a similar conflict presented in *Dayton.*

The Supreme Court based its decision in *Patsy* upon many considerations, but a dominant theme was that Congress intended the Civil Rights Acts to " 'throw open the doors of the United States courts' to individuals who were threatened with, or who had suffered, the deprivation of constitutional rights." *Patsy,* 457 U.S. at 504, 102 S.Ct. at 2561 (quoting Cong. Globe, 42d Cong. 1st Sess., at 376 (remarks of Rep. Lowe)). The Court also reiterated its earlier observation that " '[t]he very purpose of § 1983 was to interpose the federal courts between the States and the people, as guardians of the people's federal rights—to protect the people from unconstitutional action under color of state law, 'whether that action be executive, legislative, or judicial.' '" *Id.* 457 U.S. at 503, 102 S.Ct. at 2561 (quoting *Mitchum v. Foster,* 407 U.S. 225, 242, 92 S.Ct. 2151, 2162, 32 L.Ed.2d 705 (1972) (quoting *Ex parte Virginia,* 100 U.S. 339, 346, 25 L.Ed. 676 (1880))). These are powerful legislative purposes, not lightly ignored, buttressing an unambiguous decision by the Court to allow federal plaintiffs to file section 1983 actions without first exhausting their administrative remedies.

Further, the Court in *Patsy* did not just simply hold that *section 1983,* as drafted and intended, does not require prior exhaustion of administrative remedies. It went on to decline expressly the invitation to involve the federal courts in the *judicial* creation of administrative exhaustion rules

---

**5.** Although the PPTNC has already denied plaintiff's request for network funding, it has yet to reach a decision on plaintiff's request for net-

work interconnection. *See* Opinion, 808 F.Supp. at 428.

under section 1983, even a limited exhaustion requirement such as that suggested here where administrative proceedings have been imitated but not concluded prior to filing a section 1983 action:

> Beyond the policy issues that must be resolved in deciding *whether* to require exhaustion [of administrative remedies], there are equally difficult questions concerning the design and scope of an exhaustion requirement. The questions include ... whether federal courts could grant interim injunctive relief and hold the action pending exhaustion, or proceed to judgment without requiring exhaustion even though exhaustion might otherwise be required, where the agency is powerless or not inclined to grant such interim relief. These and similar questions might be answered swiftly and surely by legislation, but would create costly, remedy-delaying, and court-burdening litigation if answered incrementally by the judiciary in the context of diverse constitutional claims relating to thousands of different state agencies.

*Id.* 457 U.S. at 513–15, 102 S.Ct. at 2566–67 (emphasis in original) (footnote omitted). Indeed, the Court reversed the Sixth Circuit's attempt to create a "flexible" rule that would require exhaustion when certain minimum conditions are met. *Id.* 457 U.S. at 499, 102 S.Ct. at 2559. Thus, it is plain from *Patsy* that a plaintiff such as the plaintiff in this case need not exhaust *in any way* its administrative remedies prior to proceeding with a section 1983 action and that the courts should not involve themselves in the creation of exceptions to this rule.

As discussed above the policies underlying *Patsy* are in conflict with those underlying *Younger* and *Dayton*. In deciding *Dayton*, however, the Court itself recognized this conflict and, yet, reconciled these competing interests:

> The application of the *Younger* principle to the pending state administrative proceedings [in *Dayton*] is fully consistent with *Patsy* ... [because] [u]nlike *Patsy*, the administrative proceedings are *coercive* rather than remedial, began before any substantial advancement in the federal action took place, and involve an important state interest.

*Dayton*, 477 U.S. at 627 n. 2, 106 S.Ct. at 2723 n. 2 (emphasis added) (citation omitted). To reconcile these decisions, then, the Court focused upon their procedural posture. *See also Ivy Club*, 943 F.2d at 280 & n. 12 (recognizing distinction in the procedural posture of these decisions in distinguishing *Younger* and *Pullman* abstention doctrines). In *Dayton*, the federal plaintiff had been subjected to a coercive state administrative proceeding and sought relief from that proceeding through vindication of its federal rights in a section 1983 action. The Court held that such an action must be dismissed under *Younger* pending resolution of the state proceedings. In *Patsy*, the federal plaintiff chose not to exercise her state administrative remedies, seeking instead to vindicate her federal rights by initially filing a section 1983 action. The Court held that this action should be permitted to go forward. The crucial distinction between the cases appears to be the existence in *Dayton* of an ongoing state administrative proceeding initiated by the defendant in *Dayton* prior to the federal action.[6]

The state administrative proceeding underlying the present case was initiated by the *plaintiff* here. Unlike the plaintiff in *Dayton*, the plaintiff here is not seeking to avoid a state administrative proceeding into which it has been unwillingly embroiled. This simple fact distinguishes the instant case from *Dayton* and every other Supreme Court decision upholding or requir-

---

**6.** The Court's mention in the above quoted text from *Dayton* that an additional distinction between *Dayton* and *Patsy* is that an "important state interest" was involved in *Dayton* surely cannot be taken literally. Both *Dayton* and *Patsy* involved the same important state interest—the elimination of prohibited sex discrimination. That interest was, perhaps, not as fully implicated in *Patsy* because the plaintiff there had not engaged the state administrative process designed to vindicate that interest. Accordingly, the only significant distinctions between *Dayton* and *Patsy* for present purposes are the existence and coerciveness of a state administrative proceeding.

ing *Younger* abstention of which I am aware. The plaintiff here is more closely aligned procedurally with the plaintiff in *Patsy* than the plaintiff in *Dayton.* The plaintiff here and the plaintiff in *Patsy* are identical in that neither fully exhausted available administrative remedies. The only distinction between the present case and *Patsy* is that plaintiff here afforded the state an opportunity to act, albeit truncated, before proceeding with its section 1983 action. In light of the Court's strong refusal in *Patsy* to create judicial exceptions to the rule that a plaintiff need not exhaust administrative remedies prior to proceeding under section 1983, and the *Dayton* Court's distinction of *Patsy* on the basis of an underlying *coercive* administrative proceeding, I do not consider this distinction of sufficient import to require abstention and dismissal of this case under *Younger.*

In summary, I believe that when read together, *Dayton* and *Patsy* limit the application of the *Younger* principle in a section 1983 case to those circumstances where the federal plaintiff is seeking relief from a *coercive* state proceeding. A different conclusion would do great harm to the right of citizens of this country to vindicate their constitutional rights in the federal courts without first completely exhausting their administrative remedies. As plaintiff here initiated the underlying state proceeding, *Younger* does not apply.

■ Even if *Younger* did apply to the present case as an initial matter, however, there is a significant exception to the application of *Younger* into which this case falls. This exception, referred to as the "bias exception," was expressed in *Gibson v. Berryhill,* 411 U.S. 564, 576–77, 93 S.Ct. 1689, 1696–97, 36 L.Ed.2d 488 (1973)—the decision upon which my adjudication of plaintiff's federal bias claims rests. In the Opinion, I held that the presence on the PPTNC of the eight individuals closely re-

lated to the TV Defendants violated plaintiff's federal due process right to an unbiased governmental decisionmaker, expressed by the Supreme Court in *Gibson. Gibson* involved facts remarkably similar to those at bar: Members of a state agency adjudicating important "rights" of particular individuals were found to be financially biased against those individuals.

There is another similarity between *Gibson* and the instant case, though, not mentioned in the Opinion or by the parties in their papers: The defendants in *Gibson* also argued that the district court there should have abstained under *Younger.* The Supreme Court rejected this assertion, recognizing what has been referred to as the "bias exception" to *Younger* abstention:

> Here the predicate for a Younger v. Harris dismissal [opportunity to raise and have timely decided by a competent state tribunal the federal issues involved] was lacking, for the appellees alleged, and the District Court concluded, that the State Board of Optometry was incompetent by reason of bias to adjudicate the issues pending before it. If the District Court's conclusion was correct in this regard, it was also correct that it need not defer to the Board. Nor, in these circumstances, would a different result be required simply because judicial review, *de novo* or otherwise, would be forthcoming at the conclusion of the administrative proceedings.

*Gibson,* 411 U.S. at 577, 93 S.Ct. at 1697 (footnote omitted).

Like *Gibson,* plaintiff alleged here, and I concluded, that the PPTNC is incompetent by reason of pecuniary bias to adjudicate plaintiff's requests. Accordingly, even if *Younger* did apply here as an initial matter, I need not defer under *Younger* to what I have found to be an agency crippled by pecuniary bias.[7]

---

7. I do not read footnote 16 in *Gibson* as requiring a different result. In that footnote, the Court explained that the availability of *de novo* state court review from the agency proceedings in that case would certainly not require a different result there, because the district court found

that the plaintiffs would be irreparably harmed if the agency were permitted to conclude its proceedings. *Id.* at n. 16. Although I have made no similar finding on the record before me, I do not read this elaboration by the Court as a limitation on the Court's holding that a

In conclusion, I reject defendants' assertion that I should have abstained from adjudicating plaintiff's federal claims under *Younger.*

### III.  PENNHURST

■ Defendants' final assignment of legal error concerns the injunction prohibiting the TV Defendants from designating, appointing, or sending representatives of their governing boards to be *ex officio* members of the PPTNC. This injunction was entered as a means of enforcing my finding that Act 329 is invalid under the Pennsylvania Constitution to the extent that it delegates to the TV Defendants the authority to appoint members to the PPTNC. Defendants contend that because the injunction is "inadequate" and seeks to do what the Eleventh Amendment prohibits, it violates the teaching of *Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984).

*Pennhurst* involved a federal class-action suit initiated by a resident of a Pennsylvania institution for the mentally retarded who claimed that conditions at the institution violated federal statutory and constitutional provisions and the Commonwealth's Mental Health and Mental Retardation Act of 1966 ("MHMRA"). After a lengthy trial, the district court agreed with the plaintiff and ordered that all mentally retarded residents be removed from the institution and that the state provide suitable community living arrangements to them. *Id.* at 92–93, 104 S.Ct. at 903–904. The Court of Appeals for the Third Circuit

affirmed, relying upon the district court's conclusions under federal statutory law. *Id.* at 93–94, 104 S.Ct. at 904–905. On its initial review, the Supreme Court reversed and remanded, holding that the federal statute did not create the substantive rights found by the district court. *Id.* at 95, 104 S.Ct. at 905. On remand, the Third Circuit affirmed again, this time finding that the state MHMRA fully supported its prior judgment. *Id.* The Supreme Court reversed and remanded a second time, fixing into federal jurisprudence the now well-known Eleventh Amendment doctrine that the federal courts are barred from ordering state officials to comply with state law. *Id.* at 124–25, 104 S.Ct. at 920–21.

Defendants here argue that *Pennhurst* stands for more than just this well-known proposition. Pointing to Section IV of the *Pennhurst* decision, *Id.* at 123–24, 104 S.Ct. at 920–21, defendants contend that this Court is barred from ordering the *private* TV Defendants to comply with state law because such an order is inadequate and attempts to accomplish what this Court is barred from doing under the Eleventh Amendment. Section IV of *Pennhurst* contains the Court's consideration of an alternative argument made by the plaintiffs in that case that even if the district court was barred by the Eleventh Amendment from ordering state officials to comply with state law, the district court could nonetheless enjoin the *county* officials who were involved with the institution. The Supreme Court rejected this contention because

district court need not defer under *Younger* to an administrative agency found to be constitutionally incompetent to resolve the matters before it by reason of pecuniary bias. There are several reasons. First, the bias exception has been restated without such a limitation. *See, e.g., Moore v. Sims,* 442 U.S. 415, 442 n. 15, 99 S.Ct. 2371, 2387 n. 15, 60 L.Ed.2d 994 (1979) (Stevens, J. dissenting). Second, a violation of a litigant's constitutional rights is irreparable harm *per se;* thus a specific finding of irreparable harm would seem unnecessary. *See Northern Pa. Legal Serv., Inc. v. County of Lackawanna,* 513 F.Supp. 678, 685 (M.D.Pa.1981) (citing *Elrod v. Burns,* 427 U.S. 347, 373–74, 96 S.Ct. 2673, 2689–90, 49 L.Ed.2d 547 (1976)). Third, deferral by this Court to an agency alleged and found to be constitutionally incompetent would

be tantamount to countenancing the agency's unconstitutional conduct. *See Bettencourt v. Board of Registration in Medicine,* 904 F.2d 772, 780 (1st Cir.1990). Finally, plaintiff would be placed in the anomalous position of litigating its claims of agency bias before the same agency plaintiff contends is biased.

Along these lines, I note that neither party has suggested that there are any procedures, statutory or otherwise, available to plaintiff by which it could have sought the disqualification of the eight tainted PPTNC commissioners. *See Standard Alaska Production Co. v. Schaible,* 874 F.2d 624, 629 (9th Cir.1989), *cert. denied,* 495 U.S. 904, 110 S.Ct. 1923, 109 L.Ed.2d 287 (1990) (bias exception inapplicable when plaintiff fails to utilize disqualification procedures).

any relief granted against the county officials on the basis of the state statute would be partial and incomplete at best. Such an ineffective enforcement of state law would not appear to serve the purposes of efficiency, convenience, and fairness that must inform the exercise of pendent jurisdiction.

*Id.* at 124, 104 S.Ct. at 921.

■ The Court viewed an injunction against the county officials as "partial and incomplete" because the

relief substantially concerns [the state institution], an arm of the State that is operated by state officials. Moreover, funding for the county mental retardation programs comes almost entirely from the State and the costs of the [masters appointed by the court] have been borne by the State. Finally, the [MHMRA] contemplates that the state and county officials will cooperate in operating mental retardation programs. In short, the present judgment could not be sustained on the basis of the state-law obligations of petitioner county officials.

*Id.* (citations omitted). Put differently, the Court believed that an injunction against only the county officials would be partial and incomplete because such an injunction would not vindicate the state law upon which the injunction would have been based. Indeed, enjoining *county* officials could accomplish little when the MHMRA required the removal of mentally retarded residents from the *state* institution and the establishment of *state*-funded community living arrangements. The county officials were virtually powerless to implement these state law mental health requirements.

The injunction imposed upon the TV Defendants here does not suffer from the same or similar deficiencies. First, the injunction entered against the TV Defendants merely requires that they *cease* an illegal activity in which they, alone, are engaged (appointing PPTNC commissioners); there is no requirement that the TV Defendants undertake any obligations of the Commonwealth or expend public funds, as the county officials would have been required to do in *Pennhurst.* Second, the injunction against the TV Defendants vindicates and is sustained by the state constitutional principle involved here in every respect except that it does not act to remove *current* PPTNC commissioners appointed by the TV Defendants. The state constitutional principle at issue in this case forbids the delegation to the TV Defendants of authority to appoint PPTNC commissioners. In addition to declaring Act 329 in violation of this principle, an injunction forbidding the TV Defendants from appointing PPTNC commissioners pursuant to Act 329 is part of the package of relief that plaintiff requests and that acts to enforce this state constitutional principle. The only inadequacy attributed to the injunction is that it allows current TV Defendant appointees to remain. To address this issue and provide more complete relief, however, I entered an injunction forbidding these individuals from participating in decisions concerning plaintiff, in vindication of federal constitutional principles. Thus, unlike the injunction of county officials proposed in *Pennhurst,* these injunctions, in combination, give effect to state and federal constitutional principles and have accorded plaintiff substantial relief.[8]

■ Defendants also argue that the injunction against them attempts to accomplish what the Court is barred by the Eleventh Amendment from doing. Defendants have not identified, nor am I aware of, any

---

**8.** To the extent that the relief accorded plaintiff by the injunctions and declarations entered in this case is not more "substantial," I note that these remedies have been tailored as narrowly as possible in light of equitable considerations and principles counseling the avoidance of federal constitutional questions when an issue can be decided on an alternative state law ground. *See* Opinion, 808 F.Supp. at 422.

I also note that defendant's argument of inadequacy, curious in that it encourages this Court to expand the relief entered against them, courts a slippery slope. Would not an injunction that cured the deficiency and removed the current TV Defendant appointees be inadequate too because it does not vacate and unravel every decision in which they participated, in violation of the Pennsylvania Constitution, over the past 20 years? I do not read *Pennhurst* as requiring the district courts to choose between exercising their equitable powers to some ill-defined level of adequacy or not exercising them at all.

case in which the Eleventh Amendment was held to bar a federal court injunction of private parties. I found the private TV Defendants' appointment of PPTNC commissioners to be illegal under the Pennsylvania Constitution and have enjoined them from making further appointments. Nor is this a case where the injunction entered effectively runs against the state. *See Pennhurst*, 465 U.S. at 124 n. 34, 104 S.Ct. at 920 n. 34 (dicta suggesting that the county officials in that case may have been immune from suit under the Eleventh Amendment if the relief would effectively run against the state); *see also* David L. Shapiro, *Wrong Turns: The Eleventh Amendment and the Pennhurst Case*, 98 Harv.L.Rev. 61, 81–82 (1984) (criticizing dicta in footnote 34 of *Pennhurst:* "To begin analyzing every lawsuit against a city or county or its officials to determine whether the relief sought actually 'runs against the State' is to take one more step into the quicksand of sovereign immunity doctrine.").

In summary, I conclude that the injunction entered against the TV Defendants' is not prohibited as partial and incomplete under *Pennhurst* and does not violate the Eleventh Amendment. I will deny defendants' motion for reconsideration.[9]

---

**9.** I also reject the late argument made by the PPTNC and named PPTNC commissioners that this case is distinguishable from *Gibson v. Berry-*

*hill*, 411 U.S. 564, 93 S.Ct. 1689. The distinction suggested was considered and rejected in the Opinion. It need not be addressed further here.